# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Harris, 2012 IL App (1st) 100678**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANNETTE HARRIS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-0678 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | March 29, 2012<br><br>August 24, 2012<br>August 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for felony murder predicated on armed robbery was reversed and the cause was remanded for a new trial where the failure to videotape her initial custodial interrogation violated section 103-2.1 of the Code of Criminal Procedure and rendered her inculpatory statements presumptively inadmissible and the statements she made after subsequently invoking her right to counsel also should have been suppressed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-11841; the Hon. James Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Benjamin Overby, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Sarah L. Simpson, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Fitzgerald Smith and Sterba concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant Annette Harris was found guilty of felony murder predicated on armed robbery and was sentenced to 20 years' imprisonment. Defendant raises three contentions on appeal. First, defendant contends police failed to videotape her initial custodial interrogation in violation of section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2008)), rendering her inculpatory statements presumptively inadmissible. She argues the court therefore erred in denying her motion to suppress the statements. Defendant also contends the trial court erred in denying her motion to suppress statements made later during her incarceration because although she had invoked her right to counsel, the custodial interrogation did not cease. Defendant finally argues the State failed to prove her guilty beyond a reasonable doubt of the predicate felony of armed robbery and thus her murder conviction cannot stand. Defendant also requests that we correct the mittimus to reflect her felony murder conviction rather than intentional first-degree murder.

¶ 2                        I. PROCEDURAL BACKGROUND

¶ 3    Defendant, age 39, was arrested, then charged with the first-degree murder and armed robbery of Errland "Sweets" Willams, age 69. In early April 2007, police discovered the victim, beaten and bloody, with a clothing-iron cord wrapped around his neck, in the basement of his two-flat apartment at 7446 South Champlain Avenue, Chicago. Williams, who was dependent upon social security, was known to be generous with this meager income, consorted with prostitutes and previously had been the victim of several robberies of this income. The State's case rested almost entirely on defendant's inculpatory statements made to detectives over the course of several weeks. Detectives questioned defendant at a police facility from April 20-21, 2007. Defendant first indicated involvement in the crime on April 21. From April 30 to May 2, police again questioned defendant. On May 1 and 2,

-2-

defendant fully inculpated herself as Williams' murderer.

¶ 4      Prior to trial, defendant filed a two-part motion to suppress that evidence. Defendant first alleged that statements made during her initial April 20-21 detention were not videotaped, in violation of section 103-2.1 of the Code. She alleged that, as a result, any inculpatory statements made then and thereafter should be suppressed. As defendant noted, section 103-2.1 provides that a statement of an accused made as a result of a custodial interrogation at a police station or other place of detention is presumed inadmissible as substantive evidence in a murder prosecution unless it is electronically recorded; all statements made thereafter are also presumed inadmissible. 725 ILCS 5/103-2.1 (West 2008). Defendant added that the State could not fulfill its burden of proving the statements voluntary and reliable. In part two of defendant's motion to suppress, she alleged that she had unambiguously invoked her constitutional right to counsel during her later custodial interrogation, but this request was not honored and the interrogation did not cease. This, she argued, violated *Miranda v. Arizona*, 384 U.S. 436 (1966), and its plentiful progeny.

¶ 5               A. Motion to Suppress Part I: Statement Not Videotaped

¶ 6      At the motion to suppress, defendant called Detective Brian Forberg to establish only the requisite custody under section 103-2.1. Detective Forberg testified that he proceeded to the crime scene at 7446 South Champlain on April 3, 2007, to investigate Williams' death. Once there, he learned that a witness named Antoinette Briggs had found Williams dead and that both Briggs and several other witnesses had seen Williams with an unknown prostitute in the days before his death.

¶ 7      Following this initial investigation, Detective Forberg learned that Briggs was actually the defendant, Annette Harris, and, therefore, that it was defendant who had discovered Williams' body. Various individuals from the neighborhood identified defendant as Williams' companion and stated she had "a reputation for beating" Williams. A police department data report showed defendant as the named perpetrator of an offense against Williams.

¶ 8      Detective Forberg began a 10-day search for defendant once he discovered defendant was no longer at her last known address. On April 20, 2007, Detective Forberg found defendant at her friend Sam Coffey's residence. Driving in an unmarked squad car, Detective Forberg transported defendant to Area 2 detective division headquarters for questioning regarding Williams' death. Further details regarding the time and content of these interviews were revealed at trial and will be more fully set forth later in this opinion.

¶ 9      For the purposes of the pretrial hearing on custody, Detective Forberg testified that he did not believe defendant was handcuffed and further did not know if the car doors were locked. Upon arrival at Area 2, defendant was taken to an interview room, where the door was "probably" locked. Detective Forberg did not convey that defendant could decline to answer questions or was free to leave. He also did not offer at any time to return her to her friend's residence. Defendant admitted she presented police with a false name because there was a warrant for her arrest for a probation violation. To Detective Forberg, this meant that he could not release defendant. When Detective Forberg confronted defendant regarding her

reported prior offense against Williams, she claimed it was a misunderstanding, but agreed to take a polygraph test.

¶ 10    In the same unmarked police vehicle, Detective Forberg transported defendant to a polygraph facility located at 1819 Pershing Road. Again, he did not believe she was handcuffed. The polygraph examiner presented defendant with a consent form containing *Miranda* warnings, and defendant signed it. Next to each warning appears the letter, "y." The examiner conducted the polygraph test without Detective Forberg present and asked defendant questions about Williams' death. The test revealed "some deception" relating to defendant's knowledge of the identity of Williams' killer. According to Detective Forberg, the examiner told him that defendant then implicated her boyfriend Kevin O'Neil as the person who killed Williams. Following the polygraph, Detective Forberg relayed its results to defendant and questioned her about the events leading up to her discovery of Williams' body. Defendant then implicated herself, O'Neil, and the aforementioned unknown prostitute, whom she identified as Adreana (also Adrina), and defendant stated she was to serve as the "lookout." At this point, Detective Forberg terminated the interview.

¶ 11    Detective Forberg testified that he had not recorded any of these interviews and had not advised defendant of her *Miranda* rights because she was merely a witness in the homicide investigation and not a suspect until she implicated herself.

¶ 12    Following the close of this evidence at the motion to suppress, defense counsel argued that section 103-2.1 of the Code rendered any inculpatory statements made during the April 20-21 interview inadmissible and therefore any statements made thereafter inadmissible, as well. Counsel argued defendant was in custody when she was transported to Area 2 for questioning and placed in a locked room with police aware of her outstanding warrant. He argued a reasonable person would not have felt free to leave.

¶ 13    At this point, the trial judge noted that while there was no dispute defendant was in custody for her pending probation violation, he was uncertain that one could say she was in custody for Williams' murder. The State conceded defendant was in custody on the warrant, but argued defendant was not in custody for the murder because she was a mere witness, not a suspect, rendering the statute inapplicable in its view.

¶ 14    Defense counsel responded the evidence suggested otherwise since the police were only interested in what defendant had to say about the murder, not her probation violation, but most stridently maintained that whether defendant made the statement while in custody for murder or for the probation violation was of no moment because the statute prohibited admission of any statement "made as a result of a custodial interrogation" likely to elicit incriminating evidence. Counsel further argued the officer's subjective view of the accused's status was immaterial for determining custody.

¶ 15    The court noted that polygraph examinations were "part of normal police investigations" and, as in this case, "[n]ot every police facility has all of the equipment lined up." The court then stated it was "at a loss to find [a] remedy." The court noted that "[t]here may have been some indications that it should have been videotaped," "[b]ut to suppress it outright for what I consider to be a non willful act is a remedy that's never been done before." The court stated it was not prepared to do so. The court noted that the defense was free to argue at trial about

-4-

the absence of a videotaped statement in order to attack the officer's credibility.

¶ 16          B. Motion to Suppress Part II: Invocation of Right to Counsel

¶ 17      From April 30 to May 2, 2007, defendant was interrogated by police. Detective Forberg videotaped the interrogations and, prior to questioning defendant, advised her of her *Miranda* rights. The defense presented a video of defendant's May 1, 2007, exchange with Detectives Forberg and Eberly and rested on the contents to prove defendant invoked her right to counsel. In the video, Detective Forberg entered the holding cell, apparently at defendant's request. The following exchange then occurred:

     "DEFENDANT: I was gonna say uh–is it possible if I can uh–have a few days to get an attorney.

     DETECTIVE FORBERG: A what?

     DEFENDANT: A few days to get an attorney.

     DETECTIVE FORBERG: We can't give a few days, no.

     DEFENDANT: How long can I–

     DETECTIVE FORBERG: Look, I'll be right back in okay. Let me get rid of this ***."

The video shows Detective Forberg exiting the holding cell and returning less than a minute later, accompanied by Detective Eberly. The exchange continued as follows:

     "DETECTIVE FORBERG: Okay. Are, are you, are you requesting–were you requesting an attorney because if you are we're done talking. Okay.

     DETECTIVE FORBERG: I mean that's it if you–

     DEFENDANT: But I don't know how I can call, make no call (inaudible) all my numbers at the county.

     DETECTIVE FORBERG: Pardon?

     DEFENDANT: All my phone numbers is at the county.

     DETECTIVE FORBERG: Do you no longer want to answer questions?

     DEFENDANT: Yeah, I want to answer questions.

     DETECTIVE FORBERG: Okay. That's fine then."

¶ 18      Following this evidence, defense counsel argued that defendant had unequivocally requested counsel when she asked for a few days to obtain an attorney and the interrogation should have ceased then. He argued that because it did not, any statement made following defendant's invocation of her right to counsel should be suppressed.

¶ 19      The trial court found the police responded appropriately when they told defendant "a few days" was too long to secure an attorney and then directly questioned her as to whether she wanted to have an attorney. The court found defendant voluntarily continued to answer questions. The court concluded defendant's invocation of her right to counsel was ambiguous and police questioning that followed did not violate *Miranda* and denied the motion to suppress.

¶ 20    Defendant then waived trial by jury and the case proceeded to a bench trial. The State presented the testimony of two crime scene witnesses and Detective Forberg, along with defendant's videotaped statements.

¶ 21                                    C. Trial Evidence

¶ 22                          1. Crime Scene Witnesses and Evidence

¶ 23    Angel Moffett testified that she knew Williams, defendant, and others living at 7446 South Champlain. Moffett testified that "lots of women," including herself and defendant, would "come around" when Williams received his social security checks, then take Williams' money and property. Around 3:30 p.m. or 4 p.m. on the afternoon of Williams' death, as Moffett approached Williams' apartment, a woman unknown to her opened the door and said Williams was sleeping. Moffett, however, had heard the two arguing, with the woman requesting money and Williams saying he already had given it to the woman. Moffett then encountered defendant and her boyfriend, O'Neil, outside, with the defendant exclaiming, "[n]o one is getting to Sweets today because we got this shit tied up," causing O'Neil to nod with a smirk.

¶ 24    Shirley "Penny" Williams, an admitted crack addict, testified next that she lived at 7446 South Champlain. Like Moffett, Shirley testified that defendant would pop in on days when Williams was paid social security and that she had seen Williams with the unknown woman shortly before his death. On the day in question, around 3:30 p.m. or 4 p.m., Shirley overheard defendant ask Williams for $10. When Williams denied having it, defendant said she knew he had received his check and yelled, "I want my money, bitch." Shirley heard a smack, then saw Williams with a small cut below his eye. Williams obtained change for a $20 from O'Neil to give defendant and proceeded downstairs because he had "company" there.

¶ 25    About an hour later, Shirley returned to the building, then heard defendant scream, "[t]hat bitch killed Sweets!" O'Neil emerged from the basement and ordered Shirley to call the police. Shirley saw Williams lying on the bed with a pillow over his face, a cord by his neck, and blood smeared on his body and the wall. Shirley returned upstairs and saw defendant leaving and O'Neil running after her. The parties stipulated that Shirley omitted defendant's altercation with Williams in her initial statement to the police.

¶ 26    A postmortem examination revealed Williams' cause of death was due to an assault and, the manner of death, a homicide. Detectives later recovered in Williams' bedroom a currency exchange receipt, dated April 3, 2007, at about 2 p.m., for a payout of $685 from the United States Treasury for social security. The parties stipulated that police also recovered an unwrapped condom, latex gloves, an unopened folding knife, and a clothing iron. They also stipulated that at the time of Williams' death, he had a blood alcohol level around 0.37.

¶ 27                          2. April 20-21 Interviews With Defendant

¶ 28    Detective Forberg testified, as he had at the pretrial hearing, that he interviewed defendant on April 20, 2007, at Area 2 regarding Williams' death. Detective Forberg added

the following details. The interview took place after midnight with both Detective Forberg and Detective Eberly present. Defendant stated that she found Williams lying on his bed with a bloody pillow over his face. Defendant removed the pillow, checked Williams' pulse, then observed a cord wrapped around his neck, and screamed. Before discovering Williams, defendant said she had seen a light-complected, large, big-chested female on Williams' bed.

¶ 29    A second interview took place around 4 a.m. At that time, defendant stated that she and Williams had a special relationship, "were closer than most people believed," and referred to herself as his "goddaughter." Defendant speculated that the unknown woman had robbed and "knocked out" Williams, then fled the scene. Defendant also stated she had been smoking crack with O'Neil before discovering Williams' body. Following the interview's conclusion, the detectives attempted to locate the unknown woman.

¶ 30    A third interview took place around 7 a.m. At that time, the two detectives confronted defendant about her "violent actions" in an unrelated case toward her friend Coffey. Defendant stated that she had reacted to Coffey's unwanted sexual advances. They asked defendant to submit to a polygraph examination, and she agreed. The exam took place about 9 p.m. at 1819 Pershing Road.

¶ 31    A fourth interview took place about 1:30 a.m. on April 21, 2007, at 1819 Pershing Road. Defendant admitted she served as the lookout while O'Neil and the unknown woman robbed Williams. She stated, however, that violence was not part of the plan, but O'Neil went "off-script" and struck Williams.

¶ 32    At this point, detectives stopped the interview, and defendant was transferred to the Cook County jail on her probation violation. On cross-examination, Detective Forberg acknowledged that defendant did not give written statements then and the interviews were not electronically recorded, although the police facilities were equipped with recording equipment.

¶ 33           3. April 30-May 2 Videotaped Interviews With Defendant

¶ 34    As stated, from April 30 to May 2, detectives interviewed defendant regarding the murder. These interviews were videotaped and presented to the court.

¶ 35    Detectives first interviewed defendant on April 30 around 3 p.m. for 20 minutes and on May 1 around 5 a.m. for about an hour. Defendant was twice advised of her *Miranda* rights and stated she understood. Defendant's combined statements revealed the following. Defendant gave various and shifting accounts of what occurred after she arrived at Williams' residence around 3 p.m. on the day in question. Defendant stated that both O'Neil and Adreana approached her with the plan to rob Williams, once he was drunk and asleep. Defendant stated that she saw O'Neil hit Williams "upside the head with the iron," wrap the cord around Williams' neck, and drag him. Adreana had in hand Williams' pants, which defendant assumed contained his wallet. Adreana handed O'Neil "something and took out the door." Defendant "panicked," then started "hollering." Defendant further stated that she did not receive "one dime" of money, which was split between O'Neil and Adreana.

¶ 36    About 10 a.m. on May 1, as set forth above, defendant asked whether it was possible to have a few days to hire an attorney. About 7:30 p.m., defendant agreed to be interviewed by

the polygraph examiner, even though he did not have her hooked up to the machine. Defendant stated that she had lived with Williams for about three to five years and had sex with him a couple of times. Williams on one occasion had attacked her with a knife, but she "just *** threw him down" and left. Defendant further stated that Williams received money on the first of the month and about $900 in social security on the third. He paid $200 to $350 for rent. Defendant admitted having robbed Williams some four times in the past, but denied doing so on April 3. Defendant then asked that the interview stop because she did not like the questions.

¶ 37      Around 10 p.m., defendant requested cigarettes and asked the polygraph examiner how much time accidental murder carried, and a conversation ensued. The examiner, at one point, whispered: "[C]an I tell you a secret? I think you did it." Defendant then admitted that she had accidentally killed Williams. Her combined statements to the polygraph examiner and Detectives Forberg and Eberly, who were called in, revealed that while drunk and high, defendant went to Williams' bedroom to borrow $20. Williams requested some sexual activity, which defendant refused, and he went to get his knife. Defendant stated that she "just snapped," reached for the "next thing," which was the clothing iron, and beat Williams over the head with it, then wrapped the cord around his neck. Defendant stated that Williams had stabbed her before with a knife and she was afraid for her life. She stated that she only wanted to borrow money from Williams, but did not intend to kill him.

¶ 38      About midnight on May 2, defendant gave her final inculpatory statement. Defendant added that she had been on a three-day crack binge when she asked Williams to loan her $200. Defendant added that O'Neil knew she "was going to get the money" even before she initially entered Williams' room. She had told him "I'm about to get Sweets," and O'Neil responded, "yeah we can get him." O'Neil then ushered Adreana out of Williams' room before defendant entered. On entering, defendant again stated that Williams made sexual advances, she refused, and Williams stated, "bitch I'm about to kill you," at which time defendant beat him with the clothing iron. Defendant washed the blood from her face and hands and placed her shirt in the garbage outside. She stated that once she realized what she had done, she panicked and left without money. Defendant then smoked crack with O'Neil but did not tell him what she had done. She later entered Williams' room, feigned surprise, and yelled, "oh my God that bitch did kill Sweets."

¶ 39      Defendant stated that people in the house then came downstairs and observed Williams. Everyone, including defendant, eventually returned upstairs, but O'Neil remained in the basement. Defendant said O'Neil "got the money" because she had told him where Williams "probably had hidden it," which was likely under the mattress or the rug. Detective Forberg asked defendant specifically when she discovered that O'Neil had obtained the money. She responded, after they had returned from the police station because she used $250 at that time to buy five bags of crack, which they smoked for two days. Detective Forberg pressed, "[b]ut when did Kevin tell you that he had found the money and where he found it?" Defendant responded that O'Neil did not have to tell her, saying he would not have gotten the money from anywhere else. She also stated it was possible that O'Neil could have taken more than $250.

¶ 40                              4. Trial Court's Ruling

¶ 41        Following evidence and argument, the court found defendant guilty of count VII, felony murder predicated on armed robbery, to merge with counts VIII and IX (murder and armed robbery, respectively). In so finding, the court relied almost exclusively on defendant's inculpatory statements. The court noted it did not believe defendant had approached Williams with the intent of killing him, but rather that defendant wanted to take his money and "[a] negotiation of sorts took place," and when defendant "realized that she wasn't getting the money," she grabbed the iron and beat Williams to death. The court determined that Williams, a "drunk old man," did not pose a threat, and defendant was not in fear of her life. The court found defendant, who "was covering up her tracks," decided to blame the murder on the other woman. The court further found that defendant relayed to O'Neil the location of the money, and "like vultures picking off pieces of property," the money was taken and used for a long drug binge.

¶ 42        Defendant filed a motion for a new trial. She argued *inter alia* that her motion to suppress was improperly denied based on violations of section 103-2.1 and *Miranda*. The court denied the motion for a new trial, and the case proceeded to sentencing, where defendant received a 20-year term of imprisonment. Defendant appealed.


¶ 43                                 II. ANALYSIS

¶ 44                              A. Untaped Confession

¶ 45        Defendant first challenges the lower court's denial of her motion to suppress statements. In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). We review *de novo*, however, the legal challenge to the trial court's ruling on a suppression motion. *Id*. Further, it is proper for us to consider the testimony adduced at trial, as well as at the suppression hearing. *Id*.

¶ 46        Defendant first contends her inculpatory statements, made April 20-21, were inadmissible under section 103-2.1 of the Code. Section 103-2.1 provides that any statement "made *as a result of a custodial interrogation* at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused" in a murder case unless it is electronically recorded. (Emphasis added.) 725 ILCS 5/103-2.1(b) (West 2008). If the trial court finds by a preponderance of the evidence that this provision was violated, the statute further provides that "any statements made by the defendant during or following that non-recorded custodial interrogation, even if otherwise in compliance with this Section, are presumed to be inadmissible." 725 ILCS 5/103-2.1(d) (West 2008). Defendant argues she was subject to a custodial interrogation at Area 2 and at the initial polygraph office where her statements were given, but not recorded as required. Therefore, she argues her statements made then and thereafter should be presumed inadmissible.

¶ 47        The State responds that defendant's statements were not "made as a result of a custodial interrogation," thus rendering section 103-2.1 inapplicable. The State further contends, even if they were the product of a custodial interrogation, the statements were voluntary and

reliable.

¶ 48    As a preliminary matter, we observe that the trial court determined defendant was in custody on her probation violation and, further, that "[t]here may have been some indications that [defendant's statement] should have been videotaped" under section 103-2.1. In apparent contradiction of these observations, the court declined to find that defendant was subject to a custodial interrogation under section 103-2.1. The court went on to state it was "at a loss to find [a] remedy" given the novel nature of the statute. The court further found that to the extent there was a violation of section 103-2.1, it was "nonwillful" because there was no recording equipment at the police facility.

¶ 49    We disagree with the trial court's analysis and conclusions in this specific regard. Whether the police willfully intended to violate section 103-2.1 was not dispositive. The dispositive matter was simply whether the police subjected defendant to a custodial interrogation on April 20-21, thus triggering the requirement under section 103-2.1 that they videotape her statement. Because the court's findings suggest it found Detective Forberg credible, we may address this matter in the first instance. See *Slater*, 228 Ill. 2d at 154. For the reasons stated below, we conclude defendant was subject to a custodial interrogation in violation of section 103-2.1 when she made her April 21 inculpatory statement. Given that fact and Detective Forberg's testimony that there was indeed recording equipment at the police facility when defendant made that statement, we also conclude the trial court's factual findings were against the manifest weight of the evidence.

¶ 50    In addressing defendant's claim in the first instance, we observe that our primary purpose in examining section 103-2.1 of the Code is to give effect to the legislature's intent, the best evidence of which is the statute's plain and ordinary language. See *People v. Swift*, 202 Ill. 2d 378, 385 (2002). In addition to the statute's plain language, we also may consider the reason and necessity for the statute, the evils to be remedied, and the objects and purposes to be obtained. *People v. Lucas*, 231 Ill. 2d 169, 176 (2008).

¶ 51    The legislature enacted section 103-2.1 of the Code in 2003, on the heels of the Report of the Governor's Commission on Capital Punishment (Report), which recommended that custodial interrogations of homicide suspects in police stations be videotaped in their entirety so as to strengthen confidence in the "ultimate outcome of a capital case." See Report, ch. 2, at 19-20 (Apr. 2002); *People v. Buck*, 361 Ill. App. 3d 923, 942 (2005); Pub. Act 93-206 (eff. July 18, 2005) (adding 725 ILCS 5/103-2.1). The only fair reading of the statute is that the legislature's clear intent was to ensure that statements related to murder investigations were not a result of the coercive pressures of custodial interrogation in a police facility but, rather, were both voluntary and reliable. See 725 ILCS 5/103-2.1(f) (West 2008).

¶ 52    Under the statute, a custodial interrogation occurs when a reasonable person in the suspect's position would consider herself "in custody" and is presented with a question "reasonably likely to elicit an incriminating response." 725 ILCS 5/103-2.1(a) (West 2008). With that, the legislature codified the common-law definition of custodial interrogation developed in *Miranda* and progeny. *Miranda* held that a "custodial interrogation" meant questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. *Miranda*, 384 U.S. at

444; see also *Stansbury v. California*, 511 U.S. 318, 324-25 (1994) (*per curiam*) (custody determined by how a *reasonable person* perceives her freedom to leave); *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (noting an interrogation is police practice reasonably likely to elicit incriminating response from suspect). *Miranda* recognized that incommunicado interrogation–after a person is whisked from street to station for questioning, isolated from family and friends, and suddenly loses freedom of the outside world–trades on an individual's weakness and insecurity and presents inherently coercive pressures that may compel a person to speak rather than refrain from asking for the interview to terminate. *Howes v. Fields*, No. 10-680, slip op. at 10-12 (U.S. Feb. 21, 2012); *Miranda*, 384 U.S. at 455-56. To counteract these coercive pressures and safeguard the fifth amendment privilege against self-incrimination, *Miranda* held that an individual subjected to custodial interrogation must be warned before any questioning that she has a right to remain silent, that any statement she makes may be used as evidence against her, and that she has a right to the presence of an attorney. *Miranda*, 384 U.S. at 444, 467. Like the warnings in *Miranda*, we conclude the videotape requirement under section 103-2.1 serves a protective purpose. Given that fact and section 103-2.1's codification of "custodial interrogation," we turn to *Miranda* case law for guidance in determining whether defendant here was subject to a custodial interrogation at the time of her April 21 inculpatory statement. We also find *Miranda* case law helpful in analyzing the voluntariness of defendant's statements. Just as *Miranda* declared that voluntary statements are not barred by the fifth amendment, the statute declares that voluntary and reliable statements can be admitted even if they are not videotaped. See *Miranda*, 384 U.S. at 478; 725 ILCS 5/103-2.1(f) (West 2008). We emphasize that *Miranda* case law serves only as *guidance*; it is not determinative.

¶ 53        Our supreme court has declared that whether a defendant made a statement in a custodial setting requires an examination of the surrounding circumstances of the interrogation. *Slater*, 228 Ill. 2d at 150. Relevant factors include: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *Slater*, 228 Ill. 2d at 150. After examining and weighing these various factors, a reviewing court then must make an objective determination as to whether, under the facts presented, "a reasonable person, innocent of any crime" would have believed that she could terminate the encounter and was free to leave. (Internal quotation marks omitted.) *Id*.

¶ 54        Having examined the *Slater* factors, we conclude that factors (1), (3), and (5) demonstrate that defendant was unquestionably subject to a custodial interrogation when she made her initial inculpatory statement. The evidence shows that police picked defendant up from her friend's house around midnight on April 20, after searching for her for more than a week, then transported her in an unmarked squad car to the police station and placed her alone, without family or friends, in an interview room that was likely locked. See *People v. Wheeler*, 281 Ill. App. 3d 447, 456 (1996) (police questioning at station house supports argument that suspect was in custody). Given the late-night police pickup and defendant's

disappearance following her discovery of Williams' body, we can presume she did not desire contact with police. Once at the station, defendant admitted she presented police with a false name because she had an outstanding warrant for her arrest on a probation violation. Detective Forberg confirmed this information and testified defendant was not free to leave at that point. Given these factual circumstances, we cannot accept that a reasonable person would have felt free to leave when the police officer testifies that he would not have let her go. The only logical result here is to conclude that defendant was "in custody."

¶ 55    The State counters this conclusion by arguing that defendant was not in custody for Williams' murder because "the circumstances demonstrated a lack of a formal arrest procedure as to the murder." In making this argument, the State infers that defendant's custody on the probation violation is irrelevant. This reasoning is misguided.

¶ 56    In the case *sub judice*, the only fair reading of the circumstances in the record is that the police held defendant in continued custody on the probation violation and, at best, used this custody to mask their intention to question her solely about the murder of Williams, a man with whom defendant reportedly had a history of violence. Given the manner in which police conducted the interrogation, we do not believe a reasonable person would have felt free to terminate the encounter. See *Fields*, slip op. at 13 (when a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation); *Maryland v. Shatzer*, 559 U.S. ___, ___, 130 S. Ct. 1213, 1224 (2010) (noting *Miranda* protects against the danger of coercion that results from the *interaction* of custody and official interrogation). Defendant was subjected to 5 interviews over 24 hours that were conducted with a confrontational mood of questioning, and Detective Forberg did not convey that defendant could decline to answer questions. See *People v. Braggs*, 209 Ill. 2d 492, 511-14 (2003); *People v. Townes*, 91 Ill. 2d 32, 37 (1982); *Wheeler*, 281 Ill. App. 3d at 456; *cf. People v. Anderson*, 395 Ill. App. 3d 241, 254-55 (2009) (finding defendant who willingly went to police station, but then was held over 24 hours there, questioned, and asked to take polygraph exam was considered "free to leave"). Interviews took place at midnight, 4 a.m., and 7 a.m., during which time detectives confronted defendant about her prior offense against Williams and "violent actions" toward Coffey. See *Wheeler*, 281 Ill. App. 3d at 456. Detectives subsequently asked defendant to take a polygraph exam at 9 p.m., which she did. The examiner reported that deception was noted regarding whether defendant knew the identity of the bludgeoner, and defendant then implicated O'Neil in the crime after having previously also implicated the unknown prostitute. Detectives did not rest on defendant's implication of other individuals and cease their questioning of her. If anything, the record reveals rather a laser beam focus on defendant's involvement in the Williams murder. Police again interviewed her on April 21 at 1:30 a.m., at which time they relayed to her the polygraph results and, presumably, the noted deception. See *Wheeler*, 281 Ill. App. 3d at 456. Given the persistent custodial questioning regarding a murder at early and late hours, we do not believe a reasonable person, innocent of the crime, would have felt free to terminate the encounter. This was more than mere investigatory questioning; it was a custodial interrogation of a murder suspect. See *People v. Lopez*, 229 Ill. 2d 322, 353-54, 363 (2008).

¶ 57    In reaching this conclusion, we find Detective Forberg's testimony that defendant was not a suspect for Williams' murder prior to her April 21 inculpatory statement to be

disingenuous at best. See *Lopez*, 229 Ill. 2d at 363-64. The police knew defendant had discovered Williams' body on the day he was murdered and that she had a violent history with the deceased. She had a reputation among neighbors for beating Williams and stealing his money, although she also was reputedly his "companion." This neighborhood "gossip" was corroborated by a police case report that defendant had committed a prior offense against Williams and other "violent actions" against her friend Coffey. The police, moreover, knew defendant had provided a false name, then disappeared from the crime scene shortly after discovering Williams' body. Given the trajectory of the police questioning, as well as the facts with which they confronted defendant, it is fair to conclude that they conveyed suspicion of guilt to defendant. See *Wheeler*, 281 Ill. App. 3d at 457. Police should have known that defendant could be moved to make incriminating statements in response to their persistent questioning. See *Innis*, 446 U.S. at 302-03.

¶ 58    Based on the foregoing, we conclude that defendant made her incriminating statement "as a result of a custodial interrogation at a police station or other place of detention." Under section 103-2.1, it should have been presumed inadmissible as substantive evidence against defendant in her murder trial because her statement was not electronically recorded. 725 ILCS 5/103-2.1(b) (West 2008). Defendant argues that all incriminating statements, including the later videotaped statements wherein she herself admitted to murdering Williams, must now be presumed inadmissible under subsection 103-2.1(d). See 725 ILCS 5/103-2.1(d) (West 2008).

¶ 59    The State responds that, under subsection 103-2.1(f), the presumption of inadmissibility in this case was overcome "by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(f) (West 2008). The State maintains the trial court specifically found defendant's statements, including that on April 21, were voluntary and suggests we may affirm on that basis.

¶ 60    We disagree. The portions of the record on which the State relies in making its argument offer no support. The State, for example, points to the trial court's final statements made before denying defendant's motion to suppress under section 103-2.1: "The whole purpose of this body of law on videotaping statements is because some legislatures raised concerns about whether statements were actually voluntary or not. *** It is all about voluntariness." The court's statements, when read in context, were clearly commentary on the purpose of the statute and made in response to defense counsel's argument; they were not findings of fact or conclusions of law on the record regarding whether defendant's April 21 statement or others were voluntary.

¶ 61    Indeed, under the circumstances in this case, such findings would make little sense. As discussed, the trial court failed to make an explicit determination that defendant was subject to a custodial interrogation under subsection 103-2.1(b). The court declared, instead, that the statute simply did not lend a viable remedy. See 725 ILCS 5/103-2.1(b) (West 2008). Consequently, defendant's April 21 statement was not deemed presumptively inadmissible (see 725 ILCS 5/103-2.1(d) (West 2008)), and the burden of proving defendant's statements both voluntary and reliable never technically shifted to the State under subsection 103-2.1(f). 725 ILCS 5/103-2.1(f) (West 2008); compare *People v. Richardson*, 234 Ill. 2d 233, 254

-13-

(2009) (discussing burden shifting under section 114-11 (725 ILCS 5/114-11 (West 2008)); burden of proving a confession voluntary is on the State). The State did not present evidence on that issue or even argue it to the trial court. We thus decline to conclude that defendant forfeited the issue of voluntariness on appeal, as the State now urges, when the State failed to present any pretrial evidence to which defendant could object. Defense counsel did not stipulate that defendant's April 21 statement or her later statements were voluntary or reliable, and the issue was never fully addressed.

¶ 62    The State nonetheless now argues the *totality of the circumstances* in the record before us demonstrates that defendant's April 21 statement was both voluntary and reliable. The State points to defendant's age, 39, eleventh-grade education, and criminal history, but the State relies principally on defendant's videotaped statements, made April 30 to May 2, some 10 days after defendant's initial detention on April 20. The State notes the fluidity with which defendant conversed and cooperated with detectives, as well as the absence of physical or mental coercion, observing that defendant at one point stated detectives were "father figures" and asked them to hug her. The State argues there is no other conclusion but that defendant's statements were voluntary and the State thus fulfilled its burden under the statute.

¶ 63    As the State notes, the test for voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time she confessed. *Slater*, 228 Ill. 2d at 160. Factors for determining voluntariness include: (1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention. *Slater*, 228 Ill. 2d at 160.

¶ 64    Undermining the State's argument in this specific regard is the ineluctable fact that no evidence was presented at the pretrial hearing on whether defendant's April 21 statement, made after hours of custodial interrogation, was voluntary and reliable. See, *e.g.*, *People v. Smith*, 197 Ill. App. 3d 226, 231 (1989) (State did not discharge evidentiary burden). The videotaped statements cannot now be used to fill this evidentiary gap. For example, there was no evidence presented on defendant's physical or mental state at the time she made her April 21 statement; we do not know whether defendant was fed or allowed to use the bathroom then. Likewise, the adequacy of *Miranda* warnings remains unclear. Detective Forberg testified he did not give defendant *Miranda* warnings before she gave her April 21 inculpatory statement. Although the polygraph examiner presented defendant with a consent form containing *Miranda* warnings around 9 p.m. on April 20, and defendant signed the form, the polygraph examiner did not testify. We do not know whether the examiner represented the form as pertaining only to defendant's polygraph exam or the overall police interrogation. See *Wheeler*, 281 Ill. App. 3d at 458 (*Miranda* warnings in polygraph form pertained only to polygraph examination and, as detectives did not otherwise reasonably convey warnings, *Miranda* warnings were deemed inadequate). The evidence does not demonstrate that defendant knowingly and intelligently waived the *Miranda* rights in the consent form. See *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (noting it is the State's

-14-

burden to prove *Miranda* waiver); *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009) (waiver valid if voluntary, *i.e.*, not result of coercion, intimidation, deception, and done with full awareness of rights abandoned and consequences of decision). Given the record before us, we cannot say defendant's April 21 statement was voluntary and *not* simply a result of the inherently coercive atmosphere of custodial interrogation at a police facility.

¶ 65      A contrary holding would require that we presume facts not in evidence, which we will not do. While we review the legal issue of voluntariness *de novo*, the foundation of that determination is a factual one which the trial court has the exclusive task of considering. See *In re G.O.*, 191 Ill. 2d 37, 50 (2000) (reviewing courts should not be made to surmise what factual findings trial court made regarding voluntariness); *People v. Melock*, 149 Ill. 2d 423, 462 (1992) (preliminary inquiry into voluntary nature of confession is for the trial court). Although the issue before us would normally require simple remand on the specific issue of voluntariness and relability, not a new trial (see *People v. King*, 61 Ill. 2d 326, 329-30 (1975)), our disposition on defendant's second claim requires that we reverse the judgment of the trial court and remand for a new trial.

¶ 66      Prior to retrial, the issue of whether defendant's April 21 inculpatory statement was voluntary and reliable therefore must be considered. We emphasize that whether defendant's statement was reliable is a separate inquiry from whether it was voluntary. See 725 ILCS 5/103-2.1(f) (West 2008). We further conclude that, given our disposition on defendant's second claim, defendant's May 1-2 videotaped statements cannot be used in analyzing the totality of the circumstances regarding whether defendant's April 21 statement was voluntary and reliable. If the State cannot meet its burden of proof under the statute, the April 21 statement and any admissions gathered as a result of that statement are necessarily inadmissible as substantive evidence.

¶ 67                            B. Invocation of Counsel

¶ 68      Defendant's second contention on appeal is that her right to have counsel present during custodial interrogation was violated when detectives continued to question her after she asked for an attorney. See *Edwards v. Arizona*, 451 U.S. 477 (1981). The State responds that "defendant's inquiry was directed to the availability of a lawyer and was not an unequivocal request for counsel."

¶ 69      Under *Miranda*, and as a means to protect the fifth amendment right against self-incrimination, an individual subjected to custodial interrogation or under the imminent threat of interrogation is entitled to have retained or appointed counsel present during the questioning. *Miranda*, 384 U.S. at 444-45; *People v. Schuning*, 399 Ill. App. 3d 1073, 1081-82 (2010). If the accused requests counsel at any time during the interview, she cannot be subject to further questioning until a lawyer has been made available or the individual reinitiates conversation. *Edwards*, 451 U.S. at 484-85; *In re Christopher K.*, 217 Ill. 2d 348, 376 (2005). In applying this rigid prophylactic rule developed in *Edwards*, courts must determine whether the accused actually invoked her right to counsel. *Davis v. United States*, 512 U.S. 452, 458 (1994); *In re Christopher K.*, 217 Ill. 2d at 376. This is an objective inquiry, which at a minimum requires some statement that reasonably can be construed as

an expression of a desire for counsel. *Davis*, 512 U.S. at 459; *In re Christopher K.*, 217 Ill. 2d at 378. A reference to an attorney that is ambiguous or equivocal, according to a reasonable officer in the circumstances, does not require cessation of questioning. *Davis*, 512 U.S. at 459; *In re Christopher K.*, 217 Ill. 2d at 378, 381. That is, the invocation must be sufficiently free from indecision or double meaning so as to reasonably inform authorities that the accused wishes to speak to counsel. *In re Christopher K.*, 217 Ill. 2d at 382; *People v. Tackett*, 150 Ill. App. 3d 406, 418 (1986).

¶ 70    In this case, the videotaped evidence shows that about 10 a.m. on May 1, defendant asked whether it was "possible" to "have a few days to get an attorney," to which Detective Forberg responded, "no." Defendant began to ask, "[h]ow long can I–" but was interrupted by Detective Forberg, who momentarily left the holding cell. On his return less than one minute later, Detective Forberg asked defendant whether she was requesting an attorney because if she was, they were "done talking." Defendant responded, "[b]ut I don't know how I can call, make no call (inaudible) all my numbers at the county." Detective Forberg stated, "[p]ardon," and defendant repeated, "[a]ll my phone numbers is at the county."[1] Detective Forberg then inquired, "[d]o you no longer want to answer questions?" Defendant responded, "Yeah, I want to answer questions."

¶ 71    Here, the trial court concluded that defendant's invocation of her right to counsel was ambiguous and the police questioning did not violate *Miranda*. The court further concluded that defendant voluntarily continued to answer questions. We disagree with those determinations.

¶ 72    We conclude that defendant's query, whether it was "possible" to "have a few days to get an attorney," constituted an unequivocal invocation of her right to counsel under *Miranda*. See *Smith v. Illinois*, 469 U.S. 91, 97 (1984) (*per curiam*); *Schuning*, 399 Ill. App. 3d at 1086; *People v. Eichwedel*, 247 Ill. App. 3d 393, 398 (1993). Any ambiguity in her statement was with regard to how long it would take and the process of acquiring an attorney, not with regard to whether defendant wanted one. This conclusion is buttressed by defendant's subsequent response of, "how long" would she in fact have to secure an attorney, and her statement that she did not know how to contact one because her cell phone numbers were unavailable. Detective Forberg's response that defendant could not have a few days to get an attorney and his lack of a response to defendant's query about how she would secure telephone numbers, presumably for the purpose of contacting an attorney, gave defendant the erroneous impression that counsel could not be made available or appointed then or in the

---

[1]According to the State, defendant did not say that all her phone numbers were at the county but, rather, "[a]ll my bond money is at the county." The trial court reviewed the videotape and found to the contrary that defendant indicated her phone numbers were at the county. We have reviewed the videotape and found, consistent with the trial court, that defendant referenced her telephone numbers, not bond money. We further note that our interpretation of defendant's statements at this point in the videotape contains several minor differences from that in the transcript. For example, the transcript states that Detective Forberg asked defendant: "Do you or (inaudible) want to answer questions?" Our review of that statement reveals that Detective Forberg stated: "Do you *no longer* want to answer questions?"

near future. Detective Forberg should have ceased questioning defendant. Defendant's postrequest responses to further interrogation cannot be used to cast retrospective doubt on her earlier request for counsel. See *Smith*, 469 U.S. at 100.

¶ 73 In reaching this conclusion, we find the State's reliance on *People v. Evans*, 125 Ill. 2d 50 (1988), and *People v. Quevedo*, 403 Ill. App. 3d 282 (2010), to be misplaced. In both cases, the defendants interrupted detectives in the midst of reading *Miranda* rights for clarification purposes. In *Evans*, the defendant stated: " 'We can take time for you to get a PD [public defender], right?' " *Evans*, 125 Ill. 2d at 74. When the police officer responded that it would " 'take a little while,' " that questioning would stop, and that he would call the public defender, the defendant said, " '[n]o, go ahead.' " *Id*. In *Quevedo*, after a series of lengthy exchanges between the police and defendant clarifying the right to counsel, defendant stated: " '[u]hhhh–huh. Then we're still going to wait until the attorney arrives,' " and later, " 'can the attorney come right now? Right this minute?' " *Quevedo*, 403 Ill. App. 3d at 293. The police responded that an attorney was not available that night but that defendant could request counsel and end the conversation at any time. *Id*. Defendant then stated, " '[n]o, then let's do it like you say. I'll answer what–what you guys ask me.' " *Id*. In both cases, the courts determined that the defendants did not make unambiguous requests for counsel but, rather, were merely inquiring after the availability of a lawyer. See *Evans*, 125 Ill. 2d at 75; *Quevedo*, 403 Ill. App. 3d at 293-94.

¶ 74 Unlike in *Evans* and *Quevedo*, defendant called Detective Forberg into the holding cell hours after being informed of her *Miranda* rights. She did not ask whether an attorney was available, but rather how long she had to secure one in light of the fact that she did not have her telephone contacts. Also unlike in *Evans* and *Quevedo*, here, defendant appears to have answered further questions only at Detective Forberg's prompting. She did not cast her vote to talk rather than wait for an attorney because there was no indication one would be provided for her. Defendant thus did not waive her fifth amendment right to counsel after once invoking it. See *People v. Carlson*, 224 Ill. App. 3d 1034, 1041 (1992) (holding same, where defendant inquired what his "options" were after attempting but failing to telephone counsel, and detectives did not inform defendant that he could make additional telephone call or had right to counsel before speaking, but rather questioned him further); see also *Shatzer*, 559 U.S. at ___, 130 S. Ct. at 1219 (waiver that comes at authorities' behest and not at suspect's own instigation is itself product of inherently compelling pressures and not purely voluntary).

¶ 75 Defendant's confessions after she invoked her right to counsel on May 1 at about 10 a.m. are presumptively involuntary under *Edwards* and should have been suppressed. See *Shatzer*, 559 U.S. at ___, 130 S. Ct. at 1226. This means defendant's videotaped confessions (made specifically on May 1 around 10 p.m. and on May 2 around midnight) that she murdered Williams are no longer admissible as substantive evidence.

¶ 76 The State nevertheless argues that defendant's April 21 confession, wherein she implicated herself as the "lookout" but stated that it was O'Neil who bludgeoned Williams, still may be used to sustain defendant's conviction and thus, any error regarding defendant's subsequent May statements was harmless. As stated, we do know now whether the April 21 confession was voluntary and reliable and therefore properly admitted. Even assuming it

-17-

were, the admission of defendant's May statements after she invoked her right to counsel still would require reversal and remand for a new trial in this case. Confessions carry " 'extreme probative weight,' " and therefore the admission of an unlawfully obtained confession is rarely harmless error. *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988); *Eichwedel*, 247 Ill. App. 3d at 399. Here, the trial court relied extensively on defendant's confession made following her invocation of her right to counsel to support her felony murder conviction. See *People v. Daniels*, 391 Ill. App. 3d 750, 794 (2009). We cannot say beyond a reasonable doubt that the trial court's error did not contribute to defendant's conviction. *Id*. at 793-95. The error was not harmless and we therefore reverse defendant's conviction and remand the case for a new trial. *Id*. at 795.

¶ 77                          C. Sufficiency of the Evidence

¶ 78    Defendant's third contention on appeal is that the State failed to prove her guilty beyond a reasonable doubt of the predicate felony of armed robbery. We address this issue because it affects retrial.

¶ 79    The standard of review when assessing the sufficiency of evidence is, considering all the evidence in the light most favorable to the State, whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Siguenza-Brito*, 235 Ill. 2d at 225.

¶ 80    In this case, the State charged defendant with first-degree murder predicated on armed robbery. As such, the State was required to prove that defendant, without lawful justification, performed acts that caused Williams' death while "attempting or committing" armed robbery. See 720 ILCS 5/9-1(a)(3) (West 2008). To prove armed robbery, the State was required to show that defendant, while armed with a dangerous weapon other than a firearm, took property from Williams' person or presence by the use of force or by threatening the imminent use of force. See 720 ILCS 5/18-1, 18-2 (West 2008).

¶ 81    The trial court concluded that the State had fulfilled this burden after finding that it was clear defendant wished to take Williams' money, "[a] negotiation of sorts took place," and when defendant "realized that she wasn't getting the money," she grabbed the clothing iron and beat Williams to death. The court further found that defendant relayed to O'Neil the location of the money, and "like vultures picking off pieces of property," the money was taken and used for a days-long crack binge. The court thus found defendant legally accountable for the actions of O'Neil. See 720 ILCS 5/5-2(c) (West 2008).

¶ 82    Defendant argues that, contrary to the court's findings, the evidence was not sufficient to prove beyond a reasonable doubt that any money was taken from Williams' apartment and thus her armed robbery conviction must be reversed. In support, defendant argues there was no evidence showing Williams had money on his person or in his room at the relevant time, or that defendant or O'Neil actually took Williams' money.

¶ 83    The State responds that the circumstantial evidence supports defendant's conviction. We agree.

-18-

¶ 84    It is well established that the elements of armed robbery may be proved by circumstantial evidence. *People v. Wiley*, 165 Ill. 2d 259, 297 (1995). The habit or custom of receiving cash and keeping it in the victim's home is properly admitted as circumstantial evidence that the victim had money in his home at the time of his death. *People v. Randle*, 277 Ill. App. 3d 788, 801-02 (1995). When money or property is no longer in the place where it is habitually placed, for example, it may be inferred that defendant took the property. *Wiley*, 165 Ill. 2d at 297. The circumstantial evidence, however, must be of such a conclusive nature and produce a reasonable and moral certainty that the offense charged was actually committed. *People v. Wilson*, 37 Ill. App. 3d 560, 564 (1976).

¶ 85    The evidence in this case, viewed in a light most favorable to the prosecution, established a "taking" sufficient to sustain defendant's armed robbery conviction. See *Randle*, 277 Ill. App. 3d at 802. The evidence showed that Williams received his social security check on the first and third of each month and kept it at his home. Defendant, aware of this fact, would then frequent Williams' apartment for the purpose of taking his money and admitted having robbed him four times in the past. Defendant confessed that on April 3, 2007, the day in question, she had planned to rob Williams and apprised O'Neil of that plan, informing him that the money was likely hidden under the mattress or rug. She told O'Neil, "I'm about to get Sweets," and O'Neil responded, "yeah we can get him." O'Neil then ushered Adreana out of Williams' room. Although defendant entered Williams' room around 3 p.m. for the purpose of securing the money, she then bludgeoned him to death, panicked, and reportedly left without a cent. A short time later, after defendant feigned surprise at Williams' death, O'Neil was left alone downstairs. Thereafter, O'Neil produced $250, which he and defendant used to purchase crack and which defendant stated O'Neil could not have obtained from anyone else. Police later found a receipt showing Williams had received $685 a few hours before his death, but no money was recovered from the scene.

¶ 86    On these facts, we may infer that because Williams' money was no longer in its habitual place and given defendant's admissions, defendant took the property. See *Wiley*, 165 Ill. 2d at 297-300. This conclusion is strengthened by the combined testimony of Moffett and Shirley, which suggests that defendant was in cahoots with O'Neil and used physical force to obtain money from Williams shortly before his death.

¶ 87    Finally, we note that even if we were to find the evidence insufficient to establish that defendant took Williams' property, it is more than sufficient to establish that defendant attempted to take defendant's property and in the process murdered him. See 720 ILCS 5/9-1(a)(3) (West 2008). The evidence was sufficient to find defendant guilty beyond a reasonable doubt of murder predicated on armed robbery. Accordingly, we conclude there is no double jeopardy impediment to retrial. See *Lopez*, 229 Ill. 2d at 367-68.

¶ 88                              D. Correction of Mittimus

¶ 89    Defendant finally requests that we correct the mittimus to reflect defendant's conviction of felony murder rather than intentional first-degree murder. Because we reverse and remand this case for a new trial, this issue is moot.

¶ 90                                    III. CONCLUSION

¶ 91       Based on the foregoing, we reverse the judgment of the circuit court of Cook County and remand the case for a new trial consistent with this opinion. See *Daniels*, 391 Ill. App. 3d at 794.

¶ 92       Reversed and remanded.