# Illinois Official Reports

## Appellate Court

---

### *People v. Clayton*, 2014 IL App (1st) 130743

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DOMINIQUE CLAYTON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-0743 |
| Filed | September 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Pursuant to section 103-2.1 of the Code of Criminal Procedure, the police must make an accurate electronic recording of any interrogation that is part of a murder investigation, and when a murder defendant is subjected to an unrecorded custodial interrogation, statements made by defendant during or following the unrecorded custodial interrogation are presumed inadmissible, and in defendant's prosecution for multiple counts of first degree murder, the trial court properly suppressed the recorded statements defendant made after her initial unrecorded custodial interrogation, especially in the absence of any evidence that would prove the later statements were voluntary and reliable. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-10910-03; the Hon. James L. Rhodes, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Law Offices of Hickey & Nemzin, of Chicago (Robert F. Nemzin, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan F. Frazier, and Joseph Alexander, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant Dominique Clayton was charged with multiple counts of first degree murder, attempted first degree murder, and aggravated battery with a firearm under a theory of accountability for shootings that occurred on March 6, 2008.

¶ 2    During Clayton's bench trial, as the State attempted to introduce videotape recordings of two interviews of Clayton by police, defense counsel learned that a third interview had been conducted before any of the recorded interviews. That first interview was not recorded. Clayton moved to suppress her statements to police for violation of section 103-2.1(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1(b) (West 2012)) based on the failure to record her first interview. After a hearing on Clayton's motion to suppress, the trial court found Clayton was in custody at the time of the first interview and, therefore, that the first interview should have been recorded. Based on this finding, the court suppressed the videotapes of the second and third interviews under section 103-2.1(d) of the Code. 725 ILCS 5/103-2.1(d) (West 2012).

¶ 3    The State now appeals, arguing that the trial court erred in finding that defendant was in custody at the time of her first, unrecorded interview and therefore section 103-2.1 is inapplicable. The State further contends that it overcame the presumption of inadmissibility. We disagree and affirm.

¶ 4                                    BACKGROUND

¶ 5    On the afternoon of March 6, 2008, Kenneth Thomas and Maverick Magee were shot in South Holland, Illinois, resulting in Thomas's death and serious injuries to Magee. We will not summarize the facts relating to those shootings and Clayton's connection to them as they are not relevant to the issues on appeal. Clayton, along with codefendants who are not parties to this appeal, was charged with multiple counts of first degree murder, attempted first degree murder, and aggravated battery with a firearm in connection with the shootings. Clayton was charged under a theory of accountability. Clayton's and her codefendants' bench trial commenced on December 11, 2012.

- 2 -

¶ 6        Detectives Martin Knolmayer and Kenneth Arvin were assigned to investigate the shootings. At 11 p.m. on the night of March 6, 2008, Arvin and Knolmayer, along with at least two other officers, arrived at Clayton's home. The detectives asked Clayton to accompany them to the South Holland police station to talk about the shootings. Clayton, who was 17 years old at the time, agreed and was taken to the police station in the back of an unmarked police vehicle. Arvin testified that Clayton was not handcuffed and that when she was taken to the station, Clayton was a witness and not a suspect. Arvin admitted that, prior to their arrival at Clayton's home that evening, police had compiled a list of suspects that included Clayton.

¶ 7        Once inside the police station, Clayton was taken to an unlocked interview room. According to Arvin's testimony at trial, the interview with Clayton lasted approximately 20 minutes. A videotaped recording shows an interview with Clayton that began at 3:55 a.m. on the morning of March 7, 2008, nearly five hours after she was brought to the station. At the outset of the interview, Arvin asked Clayton whether she came to the police station "voluntarily" and "of her own free will" to which she responded affirmatively. The videotape shows Clayton was advised of her *Miranda* rights, which she waived. Arvin testified that "every word" made by Clayton was recorded. After the interview ended, Clayton was taken to the lobby of the police station to wait for a family member to take her home.

¶ 8        The next day, on March 8, 2008, Clayton was arrested at her place of employment, a McDonald's restaurant. Clayton was handcuffed and taken to the police station. At the station, Clayton again waived her *Miranda* rights and spoke to police. That interview was also videotaped.

¶ 9        On the second day of Clayton's trial, as the State attempted to introduce the videotaped recordings of Clayton's interviews, defense counsel objected on foundation and authenticity grounds. The trial court overruled the objection and the videos were admitted into evidence. In the videotape of Clayton's March 7 interview, Arvin alluded to a prior interview as he questioned Clayton. When trial resumed the following day, defense counsel again objected to the introduction of the videotaped interviews, this time on the basis that there had been an interview that had not been recorded. The trial court allowed defendant to recall Arvin to clarify that he had conducted an interview of Clayton that was not videotaped. This first, unrecorded interview occurred one to two hours after Clayton was picked up from her home at 11 p.m. on March 6. Arvin testified that he took notes during the first interview but did not know where the notes were. The trial court delayed ruling on Clayton's objection until the next court date and ordered the officer to locate the notes from Clayton's first interview. The notes were never produced.

¶ 10       At the next court date, defense counsel argued that the detectives had violated section 103-2.1 by not videotaping Clayton's first interview and that the videotapes of Clayton's second and third interviews were presumed inadmissible according to the statute. Defense counsel moved to suppress the videotaped recordings of Clayton's interviews with police. The trial court then adjourned the trial and conducted a hearing on Clayton's motion to suppress the videotaped interviews.

¶ 11       Both Arvin and Knolmayer testified at the suppression hearing. Their testimony revealed more information regarding the events on the night of March 6, 2008. When they arrived at Clayton's home at 11 p.m. with other officers, Arvin and Knolmayer spoke to Clayton's parents, introduced themselves, asked to speak to Clayton, and told them they wanted to speak to her at the station about the shootings. The detectives testified that Clayton was allowed to go

to another part of the house to retrieve her jacket before she was taken to the police station. The detectives also advised Clayton's parents that they would bring her home. According to the detectives, Clayton was not considered a suspect before or after the first interview. Arvin admitted that in "canvasses" where police visit neighborhoods to interview witnesses, witnesses are generally interviewed in their homes and "suspects" are interviewed at the station. Knolmayer testified that he and the other detectives were "ordered" to bring Clayton to the station.

¶ 12 Once at the station, Clayton was taken to a room. Arvin's testimony at trial was that Clayton was taken to an interview room, but at the suppression hearing, he testified that she was taken to an "administrative room or a report-writing room." Knolmayer testified Clayton was taken to an interview room that was not equipped with videotaping equipment. According to the detectives, the door to the room was unlocked, although neither detective recalled anyone telling Clayton she was free to leave. Clayton remained there from about 11 p.m. until the conclusion of the second interview at 4:15 a.m. After bringing her into the station, one to two hours passed before the detectives interviewed Clayton. She was not given *Miranda* warnings before the first interview. The State did not elicit any testimony regarding the substance of the first interview, how long it lasted, or what Clayton's demeanor was during the interview.

¶ 13 According to Arvin, after the first unrecorded interview concluded, Clayton was taken to a second interview room, where the recorded interview began at 3:55 a.m. Although the detectives testified Clayton was still not a suspect in the shootings, Clayton was given *Miranda* warnings before the second interview.

¶ 14 Clayton's mother and father testified at the suppression hearing that on the night of March 6, 2008, the detectives came to their home and asked for Clayton. According to Clayton's parents, at least four police officers showed up, with weapons. Both testified that detectives told Clayton that she had to go with them to the police station and handcuffed her sometime after they allowed Clayton to get her jacket from another part of the home. There was no evidence that police offered Clayton's parents the opportunity to accompany her to the station or to be present for her interviews. Clayton's testimony at the suppression hearing about the events of March 6, 2008 corroborated the testimony of her parents, including that she was handcuffed and taken to the police station for questioning about the shootings. Clayton testified that both the first and second interviews were conducted in the same interview room.

¶ 15 The State's position at trial and during the suppression hearing was that Clayton was not subjected to a custodial interrogation at the time of either the first (unrecorded) or second (recorded) interview during the early morning hours of March 7, and therefore, there was no requirement that those interviews be recorded. The State did not submit any evidence regarding the second and third interviews or the voluntariness or reliability of any of the statements made during any of the interviews.

¶ 16 Following the close of the evidence at the suppression hearing, the trial court found that the first interview was custodial and should have been videotaped. The trial court found that taking a 17-year-old from her home at 11 p.m. at night without her parents and questioning her in an interview room at the station and not at her home supported a finding that Clayton was in custody. As to whether Clayton was handcuffed, the court found that she was not handcuffed when the detectives first arrived at her home because she was allowed to retrieve her jacket. But the court found that, given the conflicting testimony and the lack of any contemporaneous

- 4 -

reports, it was impossible to determine when she was handcuffed or whether she was later handcuffed at all. The trial court noted that despite directing the State to produce the notes from the first interview, the State failed to produce notes or any record of what occurred during that interview. As to whether the officers asked Clayton questions during the first interview that were reasonably likely to elicit an incriminating response, the trial court found it was likely that Clayton made some incriminating statements given the officers' decision to give her *Miranda* warnings and videotape the second interview. The trial court granted Clayton's motion to suppress the videotapes for violation of section 103-2.1.

¶ 17    Following the ruling, the State filed a motion to reconsider. The State repeated its argument that Clayton was not in custody during the March 7 interviews. The State also argued, for the first time, that the videotaped statements should be admitted under section 103-2.1(f), which provides that "[t]he presumption of inadmissibility of a statement made by a suspect at a custodial interrogation" may be "overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable." 725 ILCS 5/103-2.1(f) (West 2012). The State did not present evidence as to the voluntary nature or the reliability of any of the statements made during the interviews.

¶ 18    In denying the State's motion to reconsider, the trial court emphasized that a 17-year-old was taken by police from her home without her parents late at night and remained at the police station for at least 4½ hours without sleep and without a lawyer, that Clayton was on a list of "suspects" before the police went to her home, and that the police have no notes or record of what happened between 11 p.m. and 3:55 a.m. Thus, the trial court determined that Clayton was in custody during the first and second interviews and the State failed to meet its burden to show that the first statement was voluntary and reliable by a preponderance of the evidence.

¶ 19    Clayton's trial was stayed pending the State's appeal to this court. For the reasons that follow, we affirm the trial court's order suppressing Clayton's statements.

¶ 20                                    ANALYSIS
¶ 21    The State contends the trial court's finding that Clayton was subjected to custodial interrogation during the first interview is against the manifest weight of the evidence, thus rendering section 103-2.1 inapplicable. The State also maintains it proved by a preponderance of the evidence that the videotaped statements were given voluntarily and thus, it overcame the presumption of inadmissibility of the statements under section 103-2.1(f).

¶ 22    On review of a trial court's ruling on a motion to suppress, we afford great deference to the trial court's credibility determinations and factual findings, and we will not disturb those findings unless they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17. We review *de novo* the ultimate question of whether the motion to suppress evidence should have been granted. *Id*. In arriving at our decision, "it is proper for us to consider the testimony adduced at trial, as well as at the suppression hearing." *Slater*, 228 Ill. 2d at 149.

¶ 23    Under section 103-2.1 of the Code, police must make an accurate electronic recording of any interrogation that occurs as part of a murder investigation, and if the State subjects a murder defendant to an unrecorded custodial interrogation, "then any statements made by the defendant during or following that non-recorded custodial interrogation, even if otherwise in

compliance with this Section, are presumed to be inadmissible." 725 ILCS 5/103-2.1(d) (West 2012). Further, pursuant to section 103-2.1(f), "[t]he presumption of inadmissibility of a statement made by a suspect at a custodial interrogation at a police station or other place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(f) (West 2012).

¶ 24                    A. Whether Clayton's First Interview Was Custodial

¶ 25    The State first argues that Clayton voluntarily cooperated and spoke to police as a witness at the time of her first interview. Therefore, the State maintains, the first statement was not the product of a custodial interrogation and, thus, the mandatory recording requirement of section 103-2.1 did not apply.

¶ 26    Under section 103-2.1(a), a custodial interrogation is defined as any interrogation during which (i) a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) a question is asked that is reasonably likely to elicit an incriminating response. 725 ILCS 5/103-2.1(a) (West 2012). Section 103-2.1(a) thereby codifies "the common-law definition of custodial interrogation developed in *Miranda* and [its] progeny." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 52.

¶ 27    Factors relevant to the inquiry into whether an individual was in custody include: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *Slater*, 228 Ill. 2d at 150. After examining and weighing these factors, the trial court must make an objective determination as to whether, under the facts presented, "a reasonable person, innocent of any crime" would have believed that she could terminate the encounter and was free to leave. *Id.* (citing *People v. Braggs*, 209 Ill. 2d 492, 506 (2003), and *People v. Fair*, 159 Ill. 2d 51, 66-67 (1994)).

¶ 28    Applying the above factors to the evidence adduced at trial and at the suppression hearing, and giving due deference to the trial court's resolution of factual questions in light of its ability to observe first-hand the witnesses' credibility and demeanor, we find that virtually every relevant factor supports the trial court's finding that Clayton was in custody at the time of the first interview.

¶ 29    First considering the manner by which Clayton arrived at the police station (*Slater*, 228 Ill. 2d at 150), Clayton's visit to the station was not initiated by her, nor was she given the option to be questioned at her home or to report to the police station at a later time, although the State maintains that she was, at least at the time of her first interview, merely a witness. It is undisputed that Clayton was taken from her home at 11 p.m. and was asked to accompany the officers to the police station at a time specified by them, *i.e.*, immediately.

¶ 30    Clayton was also not afforded the opportunity to travel to the station with her parents or a family member. Instead, Clayton was transported to the police station by two officers in an unmarked police vehicle. The detectives told Clayton's parents they would give her a ride home, although they later failed to do so. Thus, Clayton did not have a means to get home on her own and was ultimately required to call someone for a ride home after the interviews ended

near dawn the next day. Thus, the manner in which Clayton arrived at the police station supports the finding that she was in custody. See *Slater*, 228 Ill. 2d at 154 ("Defendant's voluntary arrival at the [place of interrogation] by means of her own transportation is distinguishable from a situation in which a defendant is transported to and from the place of interrogation by law enforcement officers and has no other means of egress from that location.").

¶ 31    We also consider the number of police officers present, as well as the location, time, length, mood and mode of questioning. First, it is uncontroverted that at least four police officers arrived at Clayton's home. The number of officers present raises serious doubt regarding the State's contention that when police first arrived at her home, they considered Clayton to be merely a witness. Additional questions regarding Clayton's status as a witness are raised by the failure of police to question Clayton in her home, despite the acknowledgement that witnesses are usually questioned either in their homes or in the vicinity of the crime, not at a police station. Questioning conducted at a police station, particularly when a witness is not informed that he or she is free to leave and when the witness must rely on the police for transportation, presents a more intimidating and adversarial environment. *Slater*, 228 Ill. 2d at 156.

¶ 32    The time of the interview also supports the finding that Clayton was in custody. It is uncontroverted that Clayton was picked up from her home late at night and was detained at the police station for more than five hours. The fact that Clayton was held at the police station overnight belies the State's assertion that she was not in custody.

¶ 33    The State presented no evidence regarding the mood and mode of questioning during the first interview. Indeed, the State presented no evidence at all regarding what questions Clayton was asked and what answers she gave during the first interview. Thus, this factor could not possibly weigh in favor of a finding that Clayton was not in custody during that interview.

¶ 34    While there is no evidence that there was a formal arrest procedure such as booking or fingerprinting, the trial court's finding that it could not determine whether Clayton was handcuffed (after she was permitted to retrieve her jacket) because of the lack of a record as to the circumstances under which Clayton was taken to the police station is manifestly correct. Given the failure of the police to document in any way their initial encounter with Clayton, this factor is, at most, neutral. Even if Clayton was not handcuffed at all, the determination that she was in custody is supported by other facts in evidence. As we have noted, the time of the officers' arrival at Clayton's home, the number of officers present and the fact that Clayton was transported to the police station in a police vehicle all support the custodial nature of the interrogation. Further, although the room where the questioning was held was unlocked, Clayton was never told she was free to leave, even as the hours passed overnight.

¶ 35    Finally, the remaining factors also weigh in favor of finding that Clayton was in custody at the time of the first interview. The record indicates that Clayton was taken from her parents' home, her parents did not accompany her to the station, and Clayton was alone at the police station overnight. *People v. Vasquez*, 393 Ill. App. 3d 185, 190 (2009) (police asking defendant's parents to leave the defendant's hospital room so that they could question the defendant was a factor suggesting that the defendant was in custody). Moreover, although Clayton was a high school graduate, the fact that Clayton was a 17-year-old who still lived at home is a relevant consideration, as her age would impact her perception of the custodial nature of the interrogation. The State introduced no evidence that anything in Clayton's background and, in particular, any experience she might have had with the criminal justice

system, could have offset her perception that she was obligated to accompany the police to the station and answer any questions posed to her.

¶ 36 The record also supports the trial court's finding that the "suspects" list, which included Clayton's name, was generated before the police officers went to Clayton's home. The State challenges the finding that Clayton was on the "suspects" list and insists she was merely a witness at the time of the first interview. But whether Clayton was, in fact, a suspect in the investigation does not impact our determination as to whether the interrogation was custodial. *Slater*, 228 Ill. 2d at 153 (a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question of whether the individual is in custody for purposes of *Miranda*); *Stansbury v. California*, 511 U.S. 318, 324 (1994).

¶ 37 Conversely, the State's position that Clayton was considered merely a "witness" by police does not affect the objective circumstances of an interrogation and thus does not affect the custody inquiry. *Stansbury*, 511 U.S. at 323 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). Even if the police officers disclosed to Clayton that she was a witness during the first interview (and the record contains no evidence to this effect), such disclosure would be relevant only to the extent it would affect whether a reasonable person in Clayton's position would feel free to leave. Here, the evidence supports the conclusion that a reasonable person in Clayton's position would not have felt free to leave the police station.

¶ 38 Contrary to the State's position, Clayton's stay at the station was not a brief, nonintrusive encounter with police. After arriving at the station, Clayton was placed in a room to wait for one to two hours before she was first interviewed by two detectives. Before the second interview began at 3:55 a.m., Clayton was at the station nearly five hours and, during that period, no one told her she was free to leave. During the second interview, Clayton was not informed that the police considered her a witness, rather than a suspect. It was not until after the second interview concluded–at approximately 4:15 a.m.–that officers made it clear that Clayton was free to leave the station by bringing her to the station's lobby.

¶ 39 No single factor is dispositive, and in each case we consider all of the circumstances surrounding the questioning to determine whether it was custodial. *People v. Daniel*, 238 Ill. App. 3d 19, 30-31 (1992). That Clayton was taken to the police station late at night and questioned overnight are two "among many factors that bear upon the assessment whether that individual was in custody, and not the sole determinant of that issue." (Internal quotation marks omitted.) *Slater*, 228 Ill. 2d at 153. Here, examining and weighing all the various factors, and not a single factor alone, we find that a reasonable person, innocent of any crime, would not have believed that he or she could terminate the encounter or was free to leave.

¶ 40 The State maintains that the trial court "made no reference" to defendant's "explicit statement that she voluntarily accompanied the detectives to the police station." For this proposition, the State points to the videotaped recording of the second interview.

¶ 41 We cannot say that the State's argument that the videotape of the second interview shows that Clayton was a cooperating witness is supported by the evidence. As we note above, Clayton was asked to affirm that she accompanied officers to the station "voluntarily" and "of her own free will." We would hardly expect a teenager to argue the point with police. Further, there is no record of what actually occurred during the first interview, and even if Clayton

voluntarily accompanied officers to the police station, there is no record of what transpired between the time Clayton arrived at the station and the second interview nearly five hours later. If anything, the fact that Clayton was apparently left alone in an interview room for several hours in between interviews and then questioned again regarding the events of March 6 would point to a more, rather than less, coercive atmosphere. Thus, Clayton's statement in the videotape that she went to the station of her own volition bears little relevance to the custodial nature of her second interview.

¶ 42        We are also unpersuaded by the State's argument that the trial court based its decision primarily on the fact that the detectives did not have notes from the first interview, instead of analyzing the "totality of the circumstances" to determine if there was a custodial interrogation. The findings of fact made by the trial court are clearly supported by the evidence adduced at trial and the suppression hearing. The court considered not only that it could not determine what occurred during the first interview because of the failure of the State to produce the notes from the interview, but it also expressly considered the remaining relevant factors. The record amply supports the trial court's determination that Clayton was in custody during both her first and second interviews.

¶ 43        With respect to the second issue regarding the custodial nature of the interrogation–whether Clayton was asked questions during the first interview that were reasonably likely to elicit an incriminating response–the trial court reasonably inferred that the responses Clayton gave to the questions at least led the detectives to record the second interview and give her *Miranda* warnings. Indeed, Arvin testified that he was instructed by a superior to give Clayton *Miranda* warnings before the second interview, a fact that supports the inference that something Clayton said during the first interview caused the superior to conclude she should be advised of her constitutional rights. The State introduced no evidence to rebut that reasonable inference, particularly given that there is no record of what occurred during the first interview. Further, the videotape of the second interview shows that detectives alluded to her earlier statements and asked Clayton why her story was not consistent with the one she gave earlier. This likewise supports a finding that Clayton was likely asked questions designed to elicit incriminating statements during the first interview.

¶ 44        Based on the factors examined and weighed above, and the well-supported findings of fact made by the trial court, we conclude that Clayton was subjected to a custodial interrogation as defined by section 103-2.1(a) during her first, unrecorded interview with police. 725 ILCS 5/103-2.1(a) (West 2012).

¶ 45        Under section 103-2.1(d), if the court finds, by a preponderance of the evidence, that Clayton was subjected to a custodial interrogation in violation of section 103-2.1(b), then any statements made by Clayton during or following that unrecorded custodial interrogation are presumed inadmissible. 725 ILCS 5/103-2.1(d) (West 2012). Given that the trial court correctly found by a preponderance of the evidence that Clayton's statements during the first interview were made as a result of a custodial interrogation, section 103-2.1 applied and the police violated section 103-2.1(b) by failing to record Clayton's first interview. Therefore, the videotapes of Clayton's statements during the second and third interviews are presumed inadmissible.

¶ 46          B. Whether the State Overcame the Presumption of Inadmissibility

¶ 47          The State argues that the trial court erred in suppressing the videotapes of the second and third interviews because any presumption of inadmissibility was overcome by a preponderance of the evidence that the statements were given freely and voluntarily. But the State failed to adduce any evidence, other than the videotapes themselves, that the statements made during the second and third interviews were (1) voluntarily given and (2) reliable. The State first argues that the failure to record Clayton's first interview was "inadvertent." This argument, advanced for the first time on appeal, directly contradicts the position the State took in the trial court, *i.e.*, that the detectives' failure to record the first interview was based on their belief that Clayton was merely a witness. Having taken that position, we cannot allow the State to recharacterize the detectives' conduct on appeal.

¶ 48          Moreover, the State never attempted to sustain its burden to demonstrate the voluntariness of Clayton's statements at the trial court. During the suppression hearing, the State's sole contention was that section 103-2.1(b) did not apply because Clayton was not subject to a custodial interrogation. The evidence presented by the State at the suppression hearing related only to the factors relevant to the inquiry as to whether the first unrecorded interview was custodial, but no evidence was presented about the voluntariness of the statements made during the recorded interviews.

¶ 49          The preliminary inquiry into the voluntary nature of a confession is for the trial court. *People v. Melock*, 149 Ill. 2d 423, 462 (1992). Here, the trial court never had the opportunity to consider the voluntary nature of the statements made during any of Clayton's interviews because the State elected to present no evidence on the issue. Apart from failing to present evidence on the topic, the State never even argued during the suppression hearing that the videotaped statements were given voluntarily. In fact, it was not until its motion for reconsideration that the State even raised section 103-2.1(f) and the possibility that the presumption of inadmissibility of the statements could be overcome. 725 ILCS 5/103-2.1(f) (West 2012). Even then, the State did not present any evidence or argue that the recorded statements were voluntarily given. Instead, the State argued only that the first unrecorded statement was given voluntarily, an argument the trial court properly rejected. Therefore, the State failed to meet its burden to prove by a preponderance of the evidence that the statements given during any of Clayton's interviews were voluntary and reliable.

¶ 50          While the State criticizes Clayton for failing to raise any challenge to the voluntariness of the second and third statements (which we believe is a mischaracterization of the record), it is the State under section 103-2.1(f) that must overcome the presumed inadmissibility of these statements by establishing by a preponderance of the evidence that the statements were voluntary and reliable. In other words, once the trial court found the violation of section 103-2.1(b), unless and until the State satisfied its burden to show that the statements were nevertheless voluntary, they could not be used. Clayton was under no obligation to claim, much less prove, that the later statements were involuntary and because the State adduced absolutely no evidence on the voluntariness issue, it failed to meet its burden of proof and the motion to suppress was properly granted.

¶ 51          The State's additional argument that section 103-2.1 is inapplicable because it did not seek to admit the substance of Clayton's first interview (an impossibility given the lack of any record of the interview) is a transparent attempt to circumvent the requirements of the statute. Under the State's view, police could presumably use whatever coercive tactics and ask any

questions designed to elicit incriminating evidence they choose to in an unrecorded interview and, as long as the State did not attempt to use the statements made, the violation of the statute would be without consequence. But this ignores the statute's plain language. See *Harris*, 2012 IL App (1st) 100678, ¶ 51 ("The only fair reading of the statute is that the legislature's clear intent was to ensure that statements related to murder investigations were not a result of the coercive pressures of custodial interrogation in a police facility but, rather, were both voluntary and reliable. See 725 ILCS 5/103-2.1(f) (West 2008)."). In an effort to eliminate the precise type of problems encountered in this case–an unrecorded interview of a suspect in a homicide investigation–the legislature mandated that such interviews be recorded and specified consequences when they are not. Having introduced no evidence regarding the "voluntary" nature of the first interview or the contents of that interview and in light of the trial court's factually supported finding that Clayton was in custody during the first interview, the order suppressing the second and third interviews was the only result contemplated by the statute.

¶ 52 Whether the only evidence presented for the voluntariness inquiry–the videotapes–shows that the statements were voluntarily made is a question of fact for the trial court. "While we review the legal issue of voluntariness *de novo*, the foundation of that determination is a factual one which the trial court has the exclusive task of considering. [Citations.]" *Harris*, 2012 IL App (1st) 100678, ¶ 65. As noted above, the trial court had no chance to make such determination because the State never argued or even attempted to overcome the presumption of inadmissibility. Simply put, that issue was never fully addressed because the State failed to present it to the trial court. Additionally, whether a statement was reliable is a separate inquiry from whether it was voluntary. See 725 ILCS 5/103-2.1(f) (West 2012); *Harris*, 2012 IL App (1st) 100678, ¶ 66. The State never argued that the statements were reliable.

¶ 53 Although the State had multiple opportunities to present the argument (and evidence) that the statements given during the interviews were voluntary and reliable, the State failed to do so. At a minimum, the State failed to meet its burden to prove by a preponderance of the evidence that the recorded statements were given voluntarily, and on this record, by failing to argue that the statements were given voluntarily and are reliable, the State has forfeited this argument on review. See *People v. Adams*, 131 Ill. 2d 387, 396 (1989).

¶ 54                                                        CONCLUSION

¶ 55 We hold that the trial court's finding that Clayton was in custody under section 103-2.1(b) during the unrecorded first interview is not against the manifest weight of the evidence. Therefore, any statements which were made after the unrecorded interview were presumed inadmissible. 725 ILCS 5/103-2.1(d) (West 2012). Because the State failed to adduce any evidence sufficient to sustain its burden to prove that the later statements were voluntary and reliable, they were properly suppressed.

¶ 56 Affirmed.