2016 IL App (3d) 140124

Opinion filed March 23, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0124 Circuit No. 10-CF-719 |
| KEITH LITTLE, | ) ) | Honorable Stephen Kouri |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justices Carter and Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant filed a "Motion *in Limine*/Motion to Suppress Statements" on the grounds that all of defendant's self-incriminating statements should be presumed inadmissible as evidence because the homicide detectives did not strictly comply with the requirements for electronically recording his custodial interrogation as required by section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2010)).  In addition, the motion to suppress requested suppression of defendant's statements due to a violation of his *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  A jury found defendant guilty of murder and the court sentenced defendant to serve 75 years in prison.

¶ 2        On appeal, defendant challenges the trial court's decision to admit the videotaped portion of his custodial interrogation by homicide detectives and his sentence.

¶ 3        We reverse and remand.

¶ 4        BACKGROUND

¶ 5        On May 3, 2010, defendant was a passenger in a PT Cruiser that Marcus Alexander was driving at the time of a crash. Officer Corey Miller was near the site of the crash and observed defendant and the driver flee from the PT cruiser. Officer Miller unsuccessfully attempted to catch defendant during a foot chase but, after losing sight of defendant, the officer discovered a discarded revolver in a front yard of a residence in the vicinity where defendant had been running. Meanwhile, Officer Marilyn Robinson successfully apprehended defendant as he was running out of bushes approximately three blocks from where Officer Miller recovered the gun. Defendant admitted to Officer Miller that he personally discarded a revolver as he fled from the officer that day. Defendant was charged with the criminal offense of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2010)) in case No. 10-CF-423. Defendant's jury trial for the AUUW charge was scheduled for Monday, July 19, 2010.

¶ 6        On Wednesday, July 14, 2010, the State crime lab completed ballistic testing on the gun recovered by Officer Miller on May 3, 2010. According to this ballistic report, the gun was the same weapon that was previously used to murder a convenience store owner, Abdallah Kattoum (victim), on March 30, 2010.

¶ 7        On July 16, 2010, defendant was transported from the Peoria County jail to the Peoria police department where two homicide detectives, Aaron Watkins and Keith McDaniel, jointly interviewed defendant. Defendant made several incriminating statements and, on July 19, 2010, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(3) (West 2010)) in case No. 10-CF-719.

¶ 8                                    I.  Pretrial Proceedings

¶ 9           On March 1, 2013, defendant filed a "Motion *in Limine*/Motion to Suppress Statements"

(2013 motion to suppress).  The 2013 motion to suppress asked that all statements relevant to the

murder prosecution be suppressed pursuant to section 103-2.1 of the Code (725 ILCS 5/103-2.1

(West 2010)) because defendant was subjected to a custodial interrogation as part of a homicide

prosecution and the initial custodial interrogation was not properly electronically recorded.  In

addition, the 2013 motion to suppress requested suppression of defendant's statements in both

cases due to a violation of his *Miranda* rights.

¶ 10          The hearing on the 2013 motion to suppress began on June 20, 2013.  Judge Kouri, the

trial judge, considered the transcripts from a previous motion hearing in the murder case that was

conducted before Judge Lucas in 2012.[1]  The transcripts from the 2012 motion to suppress

hearing are summarized below.

¶ 11          Officer Kris Kampas testified at the 2012 motion to suppress hearing that he transported

defendant from the Peoria County jail to the Peoria police station at 3:50 p.m. on July 16, 2010,

at Watkins' request.  Officer Kampas later transported defendant back to the Peoria County jail

from the Peoria police station at 8:25 p.m. on the same day.  According to the officer, it was a

10-minute drive from the Peoria County jail to the Peoria police station.

¶ 12          Detective McDaniel testified that he and Watkins were assigned to investigate the murder

of the victim that took place on March 30, 2010.  After a few days, all leads dried up and the case

became a cold case until Watkins contacted McDaniel around 5:20 p.m. on July 16, 2010, after

receiving the ballistics report, and requested McDaniel to assist Watkins with an interview.

_____

[1]On February 23, 2012, defendant filed a motion to suppress the statements he made to
the detectives on July 16, 2010.  On June 28, 2012, Judge Lucas received the sworn testimony of
Officer Kris Kampas, Detective McDaniel, Detective Watkins, and defendant.  On December 3,
2012, Judge Lucas entered a written order denying the 2012 motion to suppress.  This ruling is
not at issue on appeal.

McDaniel arrived at the police station at approximately 5:30 p.m. on July 16, 2010. Watkins first updated McDaniel on the details surrounding defendant's arrest for AUUW on May 3, 2010. Watkins told McDaniel that defendant and another person "got stopped after a high speed chase and that the gun was in the car." Watkins explained to McDaniel that defendant was incarcerated in the Peoria County jail due to the gun case. Watkins did not tell McDaniel that Watkins had spoken to defendant before McDaniel arrived at the police station on July 16, 2010.

¶ 13 According to McDaniel, at 6 p.m. on July 16, 2010, Watkins took McDaniel into the interrogation room and introduced McDaniel to defendant. McDaniel agreed that defendant was in custody at the time they spoke to defendant, but they did not record the interview and did not *Mirandize* defendant. McDaniel explained, "[A]t that point in time Mr. Little was not a suspect in this case [the murder case] and we weren't required to video at that time." McDaniel testified, "[W]e were under the impression or from prior experience that because you are in mere possession of a gun that is involved in a murder, you are not a suspect in the case." McDaniel stated, "Questioning is asking mere questions. An interrogation, I believe, is accusing him of something." McDaniel clarified, "Asking a question would be, do you have knowledge of the murder? An interrogation would be, we know you were there, tell us what was going on."

¶ 14 McDaniel and Watkins told defendant they "wanted to talk to him about a key piece of evidence that he was arrested for." McDaniel testified at the 2012 hearing, "After Mr. Little said he didn't know anything about the homicide, I believe that's when I came in and started talking about the severity of the case and his importance of his cooperation in this case." According to McDaniel, this discussion lasted for 7 to 10 minutes before defendant admitted he had some knowledge about the homicide, but defendant said he was afraid to say anything because the murder involved a family member.

4

¶ 15		After defendant told the detectives about his cousin, Marcus Alexander, McDaniel said he directly asked defendant if defendant witnessed the murder, stating, "That's important. That goes to credibility and things that we could use when we talk with Marcus." Defendant affirmatively responded that he was present at the Peoria Food Mart at the time of the murder. McDaniel testified, "After he told us that he was present in the store and that his cousin was involved, yes, he was deemed a suspect at that time."

¶ 16		However, McDaniel stated the detectives spoke with defendant for another 5 to 10 minutes before suspending the questioning to move defendant to a different interrogation room where defendant smoked a cigarette. The detectives also ordered some food for defendant.

¶ 17		At approximately 6:35 p.m., the detectives returned defendant to the first interrogation room where the video recording equipment was activated. As defendant was eating the food provided by the detectives, Watkins provided defendant with his initial *Miranda* warnings. Defendant then gave a detailed statement of what occurred at the Peoria Food Mart on March 30, 2010.

¶ 18		Detective Watkins testified that he was new to the detective bureau. When he was assigned to investigate the victim's murder on March 30, 2010, McDaniel provided some guidance and "was walking [Watkins] through the process of investigating that type of case."

¶ 19		Watkins advised the court that Sergeant Boddie notified Watkins, on July 14, 2010, that there had been a "hit" on a murder case from March 30, 2010. Watkins learned that a gun recovered from defendant on May 3, 2010, was determined to be the murder weapon used on March 30, 2010. Consequently, Watkins made arrangements to interview defendant on July 16, 2010, and contacted McDaniel.

5

¶ 20    On July 16, 2010, Watkins said he waited for defendant to arrive at the police station and, once he arrived, Watkins said he and McDaniel both talked to defendant at the same time. Watkins denied talking with defendant before McDaniel arrived at the police station.

¶ 21    According to Watkins, the unrecorded segment of the interview with defendant began at 6 p.m. Watkins said the detectives were just trying to determine if the gun "changed hands" during those 30 days between the date of the murder and the date of defendant's AUUW arrest. Watkins said the first interview with defendant lasted about 5 to 10 minutes until defendant admitted he was present during the murder on March 30, 2010. Watkins said the videotaped segment of the interview began at 6:35 p.m.

¶ 22    Finally, defendant testified, for purposes of the 2012 motion to suppress, that he was 18 years old on July 16, 2010. At that time, defendant said he was in custody at the Peoria County jail because he could not post bail to be released on his AUUW charges. On July 16, 2010, defendant said someone from the jail staff came to his "pod" in the jail and escorted him to the front office where Officer Kampas was waiting. According to defendant, Officer Kampas handcuffed defendant at the jail and transported him directly to the Peoria police station. At the police station, Officer Kampas took defendant to a room and left him in the handcuffs for 5 or 10 minutes until Watkins came into the room and removed defendant's handcuffs.

¶ 23    Defendant testified that, other than the time he was arrested for the AUUW charge in May of 2010, he had never been questioned by police officers in an interrogation room. Defendant testified that he asked to speak to his lawyer and his father. In response, Watkins told defendant he was going to be questioned as a witness and it was not necessary for defendant to speak to either his lawyer or his father at that point in time.

¶ 24    Defendant said Watkins spoke to him alone for "close to an hour." During this time, Watkins raised his voice and used profanity. Watkins asked defendant if he knew Deangelo

6

Lindsey, and told defendant that "Deangelo Lindsey had an armed robbery and a murder on a store clerk" and he got "somewhere around 50 years or something like that."

¶ 25     Watkins told defendant if he did not implicate himself in this murder case, Watkins was going to talk to the State's Attorney and told defendant he could "get the electric chair for being in possession of the gun" because defendant was the only link to that gun and the murder. Defendant said he believed Watkins, so defendant "just started making up a story about the crime." Defendant stated he made up the story about Alexander committing the murder because Watkins said he knew Alexander was with defendant when defendant was arrested for the gun charges on May 3, 2010.

¶ 26     At some point Watkins left the room, but returned with Detective McDaniel about 10 minutes later. Watkins introduced McDaniel to defendant and told defendant to tell the story again in front of McDaniel. According to defendant, the interview with both detectives in the room lasted about 45 minutes to an hour. After defendant told the story to McDaniel in Watkins' presence, the detectives stopped the interview and left the room. Defendant requested a cigarette and the detectives took him to a different room where he smoked his cigarette. According to defendant, after smoking his cigarette, the detectives brought him back to the original room where the detectives read defendant his *Miranda* rights. Defendant then repeated the fictitious story about witnessing Alexander commit the murder.

¶ 27     In addition to considering the transcripts of the testimony from the 2012 motion to suppress hearing, as summarized above, the trial court also received the testimony of Watkins, McDaniel, and defendant during the 2013 motion to suppress hearing. The detectives' testimony during the hearing on the 2013 motion to suppress was substantially similar to the testimony contained in the transcript of the 2012 motion hearing.

7

¶ 28    However, during the 2013 motion to suppress hearing, Watkins also testified to the details of the general partial descriptions, that he and other police officers received from two witnesses on March 30, 2010, of two suspicious black individuals who were in the store just prior to the shooting, and who ran from the store after shots were fired. These descriptions did not rule out defendant as one of the two men in the store.

¶ 29    In addition, during this 2013 motion to suppress hearing, McDaniel added that he was also aware of the witnesses' descriptions of the two black men in the store just prior to the shooting. Although the detectives did not consider defendant a suspect, McDaniel agreed with the question that defendant was a "person of interest with regard to this homicide investigation" when they interviewed defendant on July 16, 2010.

¶ 30    Defendant's testimony was also consistent with his testimony from the 2012 motion to suppress hearing. For purposes of the 2013 hearing, defendant described his conversation with Watkins before McDaniel entered the interrogation room. Defendant said Watkins said if defendant told him what happened, "the State would just frown on me for being there for an armed robbery, but they really just need me to point the finger at the murderer."

¶ 31    The trial court took the matter under advisement on October 10, 2013. On October 14, 2013, the court granted the 2013 motion to suppress regarding statements "up until the point Miranda was read to defendant." However, the court found there was "enough disconnect" between the statement given before *Miranda* warnings and the statement given after the *Miranda* warnings to distinguish defendant's case from the holding in *Missouri v. Seibert*, 542 U.S. 600 (2004). The order provided, "State can use any statement made after Miranda warning is read." The court did not address or make any findings pertaining to the videotaping issues raised in the 2013 motion to suppress pursuant to section 103-2.1 of the Code. 725 ILCS 5/103-2.1 (West 2010).

8

¶ 32                                    II. Jury Trial

¶ 33        The jury trial for defendant's charge of first degree murder, case No. 10-CF-719, started

on October 15, 2013, and concluded on October 17, 2013.[2] The evidence established Peoria

police officer Derek Harwood responded to a silent alarm at the Peoria Food Mart on March 30,

2010. Harwood first spoke to two individuals in front of the store and then entered the store

where he found the store owner dead on the floor behind the cash register counter. Harwood

stated he drove past the store approximately 15 minutes earlier and observed the victim alive and

standing right inside the doorway of the store.

¶ 34        Peoria police officer Corey Miller testified to the circumstances leading to defendant's

arrest for AUUW on May 3, 2010. According to Officer Miller, defendant told him that he was a

passenger in a car being driven by Marcus Alexander. When the car crashed, defendant fled on

foot and admitted discarding the revolver, later determined to be the murder weapon, as he was

running away from Officer Miller on May 3, 2010.

¶ 35        Dustin Johnson stated he worked at the Morton Forensic Science Laboratory as a forensic

scientist. On May 5, 2010, Johnson received a gun from the Peoria police department. Around

July 15, 2010, Johnson "test-fired" the gun to do ballistics testing on the bullet fired from that

gun. Johnson compared that bullet to those recovered as evidence in unsolved shooting cases

from the area. Johnson testified he positively identified the test-fired cartridge from defendant's

gun to the bullet recovered from the unsolved murder of the victim, Kattoum. Johnson sent a

report to the Peoria police officers informing them of his findings.

¶ 36        Over the defense's continuing objection, the court allowed the State to introduce

defendant's videotaped statement, recorded on July 16, 2010, for the jury's consideration.

_____

[2]Since the only issues on appeal relate to the court's rulings on defendant's 2013 motion
to suppress statements, a condensed version of the evidence presented during the jury trial is
included in this decision.

9

Defendant opted not to testify at his jury trial. After closing arguments, the jury found defendant guilty of first degree murder on October 17, 2013.

¶ 37    Defendant filed a posttrial motion alleging the trial court erred by admitting defendant's videotaped statement. On December 19, 2013, the court denied defendant's posttrial motion and sentenced defendant to serve the maximum term of 75 years' imprisonment.

¶ 38    Defendant appeals.

¶ 39                                                ANALYSIS

¶ 40    Defendant requests this court to reverse the trial court's decision denying his 2013 motion to suppress the videotaped portion of his ongoing interrogation. In addition, defendant submits the trial court abused its discretion by sentencing defendant to the maximum term of 75 years' imprisonment for felony murder.

¶ 41    When reviewing a circuit court's ruling regarding the admissibility of a defendant's confession, we apply a two-part standard of review. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Under this standard, a circuit court's findings of fact and credibility determinations are accorded great deference and will be reversed only if the factual findings are against the manifest weight of the evidence. *Id.*; *People v. Richardson,* 234 Ill. 2d 233, 251 (2009). However, this court reviews *de novo* the ultimate question of law regarding whether the suppression is warranted. *Richardson*, 234 Ill. 2d at 251; *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 42                              I. Presumed Inadmissibility of Videotape

¶ 43    Defendant first argues the court erroneously failed to recognize that the videotaped portion of his ongoing custodial interrogation was presumptively inadmissible against defendant, as a matter of law, for purposes of his own prosecution for murder. Defendant submits the detectives did not strictly comply with the statutory videotaping requirements required by section 103-2.1 of the Code by recording the entire custodial interrogation. 725 ILCS 5/103-2.1(b)

10

(West 2010). In contrast, the State argues the videotaping provisions of the Code did not apply because at the time of the interview: (1) defendant was not in custody for purposes of the murder investigation, and (2) defendant was not yet a murder suspect.

¶ 44    The State correctly points out that the videotaping requirements only apply to custodial interrogations. The statute provides:

> "An oral, written, or sign language statement of an accused made as a result of a *custodial interrogation conducted at a police station or other place of detention* shall be presumed to be inadmissible as evidence against the accused in any criminal proceeding brought under Section 9-1, *** unless:
>
> (1) an electronic recording is made of the custodial interrogation; and
>
> (2) the recording is substantially accurate and not intentionally altered."
>
> (Emphasis added.) *Id*.

The Code also defines "custodial interrogation" for purposes of the videotaping requirements to mean "any interrogation during which (i) a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 725 ILCS 5/103-2.1(a) (West 2010). Section 103-2.1(a) of the Code mirrors and codifies " 'the common-law definition of custodial interrogation developed in *Miranda* and [its] progeny.' " *People v. Clayton*, 2014 IL App (1st) 130743, ¶ 26 (quoting *People v. Harris,* 2012 IL App (1st) 100678, ¶ 52).

¶ 45    The trial judge ordered the suppression of defendant's unrecorded and self-incriminating statements that occurred "up until the point that the Miranda Warnings were given." *Miranda* applies to custodial interrogations as well. Consequently, contrary to the State's assertion on appeal, we agree with the trial court's finding that defendant was subjected to a custodial

11

interrogation during the first segment of the interview. We give great deference to this finding of fact by the trial judge. See *Richardson,* 234 Ill. 2d at 251.

¶ 46    Here, the record supports the trial court's factual finding on the issue of whether the unrecorded interview constituted a custodial interrogation. First, Officer Kampas transported defendant from the Peoria County jail to the Peoria police station in handcuffs. Once present at the police station, defendant remained in handcuffs in the interrogation room. Although Watkins removed defendant's handcuffs, defendant was not able to leave the interrogation room or move about at the police department without the detectives' direct supervision. After a short break, the detectives escorted defendant back to the original small, locked interrogation room for further questioning. The defendant was not free to leave the interview at any point and return to the Peoria County jail. Based on these facts, the court's finding supports defendant's argument that the first segment of defendant's unrecorded interview with both detectives qualified as a custodial interrogation for purposes of both the *Miranda* warnings and section 103-2.1(b) of the Code. 725 ILCS 5/103-2.1(b) (West 2010).

¶ 47    We next turn to the State's argument that defendant was not a murder suspect in the detective's eyes when the interview began at 6 p.m. Consequently, the State submits the detectives were not required to videotape the custodial interrogation of a non-suspect during an ongoing murder investigation. When considering the State's argument, we revisit the precise language of the statute, which states:

> "An oral, written, or sign language statement of *an accused* made as a result of a custodial interrogation conducted at a police station or other place of detention shall be presumed to be inadmissible as evidence against *the accused* in any criminal proceeding brought under Section 9-1, *** unless:
>
>     (1) an electronic recording is made of the custodial interrogation; and

12

(2) the recording is substantially accurate and not intentionally altered."

(Emphases added.) *Id*.

The relevant language set forth above does not make any reference to the status of the declarant as a "suspect" at the time of the custodial interrogation. Similarly, the statutory language does not limit the videotaping requirements to investigations solely related to murder cases. Rather, the statutory language set forth above reveals that any unrecorded and self-incriminating statement by a declarant, during a custodial interrogation conducted at a police station, will be presumed inadmissible *against the accused* in criminal proceedings involving murder charges.

¶ 48      We conclude the status of the declarant as an "accused" must be measured by two objective factors to be considered by a neutral judge. First, and perhaps foremost, the declarant must be facing murder charges as part of a criminal proceeding *when* the State seeks to introduce the declarant's self-incriminating statements as evidence against the declarant. Second, the declarant's self-incriminating statement or confession must have resulted from a custodial interrogation that took place at a police station or other place of detention. Hence, the subjective beliefs of the detectives regarding the declarant's status as a witness or a murder suspect at the time of the unrecorded custodial interrogation is irrelevant and not determinative of the statement's presumed inadmissibility where the detectives have not strictly complied with the videotaping requirements. See *Clayton*, 2014 IL App (1st) 130743, ¶ 37.

¶ 49      Turning to the undisputed facts of this case, we conclude defendant was "accused" of murder when the court was called upon to determine the admissibility of the recorded second segment of the interview that began at 6:35 p.m. on July 16, 2010. Next, we return to the language of the Code to determine whether the court properly allowed the State to introduce evidence of the second recorded segment of the custodial interrogation.

¶ 50      Section 103-2.1(d) of the Code provides:

13

"If the court finds, by a preponderance of the evidence, that the defendant was subjected to a custodial interrogation in violation of this Section, then any statements made by the defendant during *or following* that nonrecorded custodial interrogation, even if otherwise in compliance with this Section, are presumed to be inadmissible in any criminal proceeding against the defendant except for the purposes of impeachment." (Emphasis added.) 725 ILCS 5/103-2.1(d) (West 2010).

Simply stated, the preponderance of the evidence in this case establishes the recorded segment of the interrogation *followed* the unrecorded segment of the custodial interrogation and therefore, is presumed inadmissible.

¶ 51    Hence, the detectives' decision *not* to record the first segment of the custodial interrogation has significant negative consequences on the prosecutor's ability to introduce compelling evidence of guilt at trial; specifically, defendant's own incriminating admissions to felony murder. Based on this record, we hold the trial court erred by failing to recognize the second portion of the custodial interrogation in this case was presumptively inadmissible, as a matter of law, because the detectives did not record the preceding segment of the interrogation as required by section 103-2.1(b) of the Code. 725 ILCS 5/103-2.1(b) (West 2010). Therefore, we reverse the trial court's ruling and hold the recorded custodial interrogation that began at approximately 6:35 p.m. was inadmissible as a matter of law.

¶ 52                II. Violation of *Miranda* Rights

¶ 53    Alternatively, defendant challenges the court's finding that there was "enough disconnect" between the statement given by defendant pre-*Miranda* and the statement given after *Miranda.* This case is controlled by well-established case law based on the holding in *Missouri v. Seibert*, 542 U.S. 600 (2004).

¶ 54    The Supreme Court, in *Seibert*, discussed the police procedure of engaging in a "question first and warn later" approach to obtaining a defendant's incriminating statements. *Id.* at 611-12. The Supreme Court held, under the facts in *Seibert*, "the question-first tactic effectively threaten[ed] to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted." *Id*. at 617. Further, the *Seibert* court held the facts did not reasonably support a conclusion that the *Miranda* warnings given could have served their purpose after the defendant already made an unwarned statement to the police. *Id*. Therefore, the court held that Seibert's postwarning statements were procured by law enforcement officers in violation of *Miranda* and were inadmissible. *Id.*

¶ 55    In *People v. Lopez*, 229 Ill. 2d 322, 358 (2008), our supreme court adopted the *Seibert* holding and followed the new test announced in *Seibert* to determine whether *Miranda* warnings, delivered after initial questioning, could be effective enough to protect a suspect's rights. The *Lopez* court acknowledged that police officers might not generally admit that they deliberately withheld a *Miranda* warning to obtain a confession. *Id*. at 361. Further, there might be situations where an officer might mistakenly rather than deliberately withhold *Miranda* warnings. *Id*. at 364. Therefore, to determine whether postwarning statements were admissible, our supreme court examined " 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.' " *Id*. at 358 (quoting *Seibert,* 542 U.S. at 615).

¶ 56    The facts in *Lopez* involved a juvenile who spoke to police without a parent and without the benefit of *Miranda* warnings. Even though the second interview occurred two hours later, after *Miranda* warnings and after the juvenile spoke to his father who was present during the

15

second interview, the *Lopez* court suppressed the contents of the second interview. In *Lopez*, our supreme court discussed and applied the rationale used in *Seibert* as illustrated by the language from *Lopez* set forth below:

> "The plurality looked to the passage of time between the unwarned and warned statements, the location where those statements were taken, whether the same person questioned the suspect during the unwarned and warned statements, whether details obtained during the unwarned phase were used during the warned phase, and whether the suspect was advised that the unwarned statement could not be used against the suspect. [Citation.] The plurality also considered whether '[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before.' "
>
> *Id.* at 364-65 (quoting *Seibert*, 542 U.S. at 616-17).

¶ 57 Here, although defendant was 18 years old, the *Lopez* case is instructive. In this case, the unwarned custodial interrogation began at 6 p.m. Using McDaniel's timeline, this portion of the interrogation lasted approximately 15 minutes. Both detectives and defendant agreed that defendant smoked a cigarette in another room before the second custodial interview with *Miranda* warnings began at 6:35 p.m. on the same date, in the same interrogation room, with the same detectives present. It is undisputed that defendant had enough time to smoke a cigarette between the first and second interview, but he did not leave the police station and remained in custody at all times from 3:50 p.m. until he was transported back to the jail at 8:25 p.m. Unlike Lopez, this defendant did not speak to anyone during the short break between interviews. Further, defendant did not have an opportunity to telephone his lawyer or his father between interview segments. We conclude a cigarette break is not a sufficient amount of time to remove the taint of the original *Miranda* violation.

¶ 58    The trial court's finding that there was "enough disconnect" between the statement given before *Miranda* and the statement given after *Miranda* making *Seibert* inapplicable is contrary to the manifest weight of the evidence discussed above.  Therefore, we conclude that defendant's videotaped portion of the custodial interview also should have been suppressed due to the *Miranda* violation that occurred at 6 p.m., even though *Miranda* warnings were provided by the detectives at 6:35 p.m.

¶ 59                           III.  Excessive Sentence

¶ 60    Having concluded that the trial court erred by admitting defendant's videotaped statement based on the violation of sections 103-2.1(b) and (d) of the Code (725 ILCS 5/103-2.1(b), (d) (West 2010)) and the violation of defendant's *Miranda* rights, we refrain from addressing whether the sentence imposed by the court was excessive.

¶ 61                            IV.  Double Jeopardy

¶ 62    Defendant, on appeal, asks this court to reverse the court's order denying the motion to suppress the videotaped statement and to remand this case for a new trial.  However, we are bound to consider the double jeopardy implications of a new trial.  Thus, even though defendant did not raise concerns regarding the sufficiency of the evidence or ask this court to vacate his conviction outright, we are required to consider the sufficiency of the evidence against defendant for double jeopardy purposes.  *Lopez*, 229 Ill. 2d at 366-67 (citing *People v. Garner,* 147 Ill. 2d 467, 483 (1992)).  The *Lopez* court instructs us to consider whether all of the evidence presented at trial, including the now-suppressed statement, was sufficient to convict.  *Id*. at 367 (quoting *People v. Olivera,* 164 Ill. 2d 382, 393 (1995)).  The relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Id.* (citing *Olivera,* 164 Ill. 2d at 396.)

17

¶ 63    In the case at bar, looking at all of the evidence presented at trial in a light most favorable to the State, including defendant's now-suppressed statements and defendant's unexplained recent possession of the murder weapon, we conclude the evidence would have been sufficient to convict.  Therefore, retrial is not barred by double jeopardy.

¶ 64                                      CONCLUSION

¶ 65    For the foregoing reasons, we reverse the court's ruling denying defendant's motion to suppress his videotaped statement and remand this case for further proceedings consistent with this order.

¶ 66    Reversed and remanded.